| | |
|---|---|
| DOCKET NO.: CV 01 0808376S | : SUPERIOR COURT |
| THOMAS O'CONNOR<br>    Plaintiff, | : J.D. OF HARTFORD |
| v. | : |
| WETHERSFIELD BOARD OF EDUCATION<br>    Defendant. | : JUNE 10, 2003 |

## AMENDED COMPLAINT

**FIRST COUNT** (Breach of Contract)

1. The plaintiff, Thomas O'Connor, was a tenured teacher in Wethersfield, Connecticut. He was a teacher, and an employee of the Wethersfield Board of Education, from 1982 until 2003.

2. The plaintiff's tenure is a property right protected by the Constitution of the State of Connecticut.

3. The defendant is the Board of Education in Wethersfield, Connecticut.

4. On or about March 25, 1999, O'Connor was placed on paid administrative leave.

5. The defendant investigated O'Connor until October, 1999, seven months later. The defendant concluded the plaintiff had engaged in unacceptable conduct and would be returned to his teaching assignments subject to a remediation plan.

6. On March 29, 1999 Dr. Fred Rubin, O'Connor's cardiologist, informed the defendant that the plaintiff was under stress because of the investigation, and that the stress was exacerbating his pre-existing heart disease.

EXHIBIT A

7. As of October 22, 1999, when the investigation was completed, the only thing that prevented the plaintiff from returning to work was questions about his physical health. The questions about his work performance and the allegations against him had been investigated, and a remediation plan was in effect. The plaintiff received his course assignments.

8. On October 22, 1999 the defendant directed the plaintiff to "provide notification from your doctor as to your medical fitness to return to work." The "doctor" referred to was Dr. Rubin.

9. On October 25, 1999, Dr. Rubin wrote to the defendant, "Mr. O'Connor is doing well from a cardiac standpoint and, from that point of view, he could return to work. However I am extremely concerned about his severe anxiety and worry that this will affect his health problems. However, I am not a psychiatrist nor am I his general physician. I would strongly suggest that these issues be directed to his general physician."

10. The defendant did not, however, consult the plaintiff's general physician. When the plaintiff later submitted this physician's opinion that "there is no reason to think that he is not medically fit to return to work," the defendant disregarded it.

11. On November 5, 1999 the defendant reaffirmed to the plaintiff he was being called back to work and, "[A]bsent any written documentation from another physician or psychiatrist to the contrary, it appears that you are medically cleared to return to work if so directed."

12. On December 7, 1999, approximately one day after the plaintiff and some of his supporters protested his treatment at a public school board hearing, the defendant ordered the plaintiff to undergo a psychiatric examination by Dr. Harold Schwartz at the Institute for Living. The reason given for this was Dr. Rubin's letter written six weeks earlier, which was a pretext.

13. The defendant ordered O'Connor to sign an authorization form allowing it and its administrators and Dr. Schwartz to obtain, without limitation, all of the plaintiff's medical records and history, including all records of prior consultations with psychotherapists and addiction treatment counselors. The plaintiff declined to do so.

14. The authorization form did not meet the requirements for such a form imposed by the United States and by the State of Connecticut (CFR 2.31 and Conn. Gen. Stat. 52-146e, 42 USC 290dd, and 2. 42 CFR 2.31).

15. O'Connor objected to having to undergo an examination by a psychiatrist hired by the defendant, but he went nevertheless because he had been warned his refusal to go would be deemed insubordination. On January 4, 2000 the plaintiff spent approximately two hours with Dr. Schwartz. Dr. Schwartz inquired into O'Connor's parents' marital history; the lives and marriages of O'Connor's siblings; the events surrounding O'Connor's father's violent death; the incidence of alcoholism in O'Connor's family; and other personal and private details. Schwartz did not inquire about O'Connor's job.

16. Dr. Schwartz was acting on behalf of the defendant, and there was no confidentiality between O'Connor and Schwartz.

17. At the conclusion of the session, Dr. Schwartz informed O'Connor that he would have to return for a battery of invasive psychological tests.

18. On January 20, 2000 the defendant warned O'Connor that he would be deemed insubordinate if he did not schedule another appointment with Dr. Schwartz, undergo continued examination and testing, and sign the illegal authorization permitting the defendant and the psychiatrist to obtain his medical and psychological records and to speak with his present and former teachers.

19. On January 24, 2000, Dr. Rubin wrote to the defendant and informed it, "At this point, I feel that [the plaintiff] is capable of returning to work. His cardiac condition is stable. In addition, he is now much calmer and I think that his anxiety level does not represent a significant risk in terms of his cardiac condition."

20. On January 26, 2000, the plaintiff's primary care physician, Dr. Eric Shore, wrote the defendant, "I last saw [the plaintiff] on 1/18/00 at which time he had a cough as well as an unstable sternum from previous open heart surgery . . . . Nevertheless, his vital signs were normal and his pulmonary function studies were certainly adequate that there is no reason to think that he is not medically fit to return to work. Regarding his mental fitness, I do not hold myself as an expert, but from what I know of Tom, while he may be a free spirit, I do not see him as mentally unfit to return to work either."

21. On January 28, 2000, the plaintiff notified the defendant he had called Dr. Schwartz to set up a second appointment, and he also issued a release authorizing Dr. Schwartz to speak with Dr. Rubin.

22. On January 28, 2000 the plaintiff filed a lawsuit in Superior Court which was substantially similar to this lawsuit. It was removed by the defendant to federal court.

23. On February 1, 2000, the defendant notified the plaintiff that his appointment with Dr. Schwartz was canceled by the defendant because the plaintiff had filed a lawsuit. Superintendent Pierson wrote:

> It is my understanding that on the advice of your lawyer you have once again decided to participate in with the independent psychiatric examination being conducted by Dr. Schwartz. However, because of the lawsuit recently filed by you challenging the Board's right to require you to undergo this independent psychiatric evaluation, I have advised Dr. Schwartz not to proceed further with his evaluation until the Superior Court has ruled on your motion for a permanent injunction. You will remain on [medical] leave until this issue has been resolved.

The defendant then kept the plaintiff out of school, away from his students, in a status of involuntary medical leave. He was forced to use up his own accrued sick leave, though he was not sick.

24. On March 20, 2000, Dr. Les Smith, a board-certified psychiatrist who saw O'Connor, wrote to defendant, "It is my opinion, with a reasonable degree of medical certainty, that Mr. O'Connor is not currently disabled by a psychiatric disorder and is able to return to work at this time."

25. On March 30, 2000, the defendant was invited "to pose whatever reasonable questions [of Dr. Smith] you might have concerning Mr. O'Connor's work capacity." The defendant declined to put questions to Dr. Smith. The defendant has

never explained why, if it had questions about the plaintiff's psychiatric status, it never took advantage of this opportunity.

26. The plaintiff submitted three opinions from three physicians, including a psychiatrist, that was fit to return to work.

27. On November 1, 2000, the defendant notified the plaintiff that as of November 30, 2000 his pay would be cut off.

28. On November 17, 2000, the plaintiff reaffirmed his willingness to return to Dr. Schwartz.

29. From approximately November 5, 1999 to January 28, 2002, the defendant withheld the plaintiff's regular salary, though his contract of employment remained intact pursuant to Conn. Gen. Stat. 10-151.

30. On December 4, 2000, the defendant reaffirmed that it was the plaintiff's law suit which caused it to keep the plaintiff out of his teaching position and to deny him his wages.

31. The defendant had no compelling or even legitimate interest in the plaintiff's past psychiatric and alcohol/drug treatment records.

32. In requiring the plaintiff to see Dr. Schwartz and to expose private medical and psychiatric facts, and in insisting that the plaintiff sign an illegal and ineffective medical authorization form, the defendant violated the plaintiff's privacy rights protected by the Constitution of the State of Connecticut.

33. The defendant knew that the plaintiff was under mental and emotional distress as a result of his being out of work, and that this distress threatened his

6

physical health. Nevertheless, the defendant refused to allow the plaintiff to return to work.

34. The defendant cut off the plaintiff's salary and effectively terminated him without the process required by the Teacher Tenure Act, Conn. Gen. Stat. 10-151. In doing so, it took the plaintiff's property without due process, in violation of the Constitution of the State of Connecticut.

35. The plaintiff's liberty interests were taken in that his good name, reputation and standing in the community were seriously damaged by the defendant, combined with deprivation of his salary. In taking the plaintiff's liberty interests without any process whatsoever, the defendant violated the Constitution of the State of Connecticut.

36. The defendant deprived the plaintiff of his job and his salary because he did not return to Dr. Schwartz. He did not return to Dr. Schwartz because the defendant canceled the appointment. The defendant canceled the appointment because the plaintiff brought a lawsuit protesting violation of his constitutional and statutory rights. The defendant therefore deprived the plaintiff of his liberty and property interests in retaliation for his exercising his protected rights, including his right to have access to the courts, redress of his greivances, and freedom of speech.

37. All the events described in this complaint were being carried out publicly and in full view of untold numbers of people in the plaintiff's community.

38. As a result of the defendant's actions, the plaintiff suffered severe mental and emotional distress, great embarrassment and humiliation, and physical pain, including cardiac arrhythmia and angina. He has been stigmatized, and his good name,

standing in the community, and reputation diminished, which will likely result in diminished future employment.

39. The plaintiff's physical condition became an issue because of his cardiac problems, but his cardiologist and primary care physician have cleared him to return to work. The defendant has no legal basis for probing into the plaintiff's mental and psychiatric history.

40. The Wethersfield Board of Education breached the plaintiff's contract of employment.

## SECOND COUNT (Refusal to Pay Wages)

1-40. Paragraphs 1-40 of the First Count are incorporated herein.

41. The defendant's refusal to pay the plaintiff his wages violates Conn. Gen. Stat. Sec. 31-71a et seq. This claim is brought under Conn. Gen. Stat. Sec. 31-72. The plaintiff claims twice the full amount of wages owed, with costs and attorneys' fees pursuant to the statute.

## THIRD COUNT (Wrongful Constructive Discharge)

1-40. Paragraphs 1-40 of the First Count are incorporated herein.

41. The plaintiff has been constructively discharged in violation of public policy.

## FOURTH COUNT (State Constitutional Claim)

1-40. Paragraphs 1-40 of the First Count are incorporated herein.

41. The defendant violated the rights of the plaintiff which are guaranteed by the Constitution of the State of Connecticut. These rights include the plaintiff's right to file a law suit and have access to the courts; his right not to have property taken without due process; his right not to have his liberty interests taken without due process; and his right of privacy.

**FIFTH COUNT** (Negligent Infliction of Emotional Distress)

1-40. Paragraphs 1-40 of the First Count are incorporated herein.

41. The defendant knew or should have known its conduct would cause the plaintiff to undergo an unreasonable of risk of emotional distress which might result in illness or bodily harm to the plaintiff.

**SIXTH COUNT** (Intentional Infliction of Emotional Distress)

1-40. Paragraphs 1-40 of the First Count are incorporated herein.

41. The defendant intended to inflict emotional distress, or it knew or should have known that emotional distress was the likely result of its conduct.

42. The defendant's conduct was extreme and outrageous.

**SEVENTH COUNT** (Tortious Invasion of Privacy)

1-40. Paragraphs 1-40 of the First Count are incorporated herein.

1-41. Paragraphs 1-41 of the First Count are incorporated herein.

42. The defendant, by itself and through its agents, including Dr. Schwartz, intentionally intruded into the private affairs of the plaintiff.

43. The defendant's intrusion would be highly offensive to a reasonable person.

**EIGHTH COUNT** (Statutory Violation of Constitutional Rights)

1-40. Paragraphs 1-41 of the First Count are incorporated herein.

42. The defendant has subjected the plaintiff to discipline and constructive discharge in violation of Conn. Gen. Stat. 31-51Q.

THE PLAINTIFF,

BY: *[signature]*
Leon M. Rosenblatt
Law Offices of Leon M. Rosenblatt
10 N. Main Street
West Hartford, CT 06107
(860) 523-8066
Juris #: 417820

| | |
|---|---|
| DOCKET NO.: CV 01 0808376S | : SUPERIOR COURT |
| THOMAS O'CONNOR<br>    Plaintiff, | : J.D. OF HARTFORD |
| v. | : |
| WETHERSFIELD BOARD OF EDUCATION<br>    Defendant. | : JUNE 10, 2003 |

### DEMAND FOR RELIEF

The plaintiff claims:

1. Monetary damages in excess of $15,000;

2. Attorneys' fees and costs;

3. Punitive damages;

4. All damages available under Conn. Gen. Stat. 31-72 and 31-51q;

5. Such other relief as the court may deem just and equitable.

THE PLAINTIFF,

BY: _____
Leon M. Rosenblatt
Law Offices of Leon M. Rosenblatt
10 N. Main Street
West Hartford, CT 06107
(860) 523-8066
Juris #: 417820

11

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this the 10th day of June, 2003 to:

Attorney Michael J. Rose
Howd & Ludorf
65 Wethersfield Ave.
Hartford, Connecticut 06114

_____
Leon M. Rosenblatt