DOCKET NO. CV 01 0808376          :          SUPERIOR COURT

THOMAS O'CONNOR                   :          JUDICIAL DISTRICT OF HARTFORD

VS.                               :          AT HARTFORD

WETHERSFIELD BOARD OF
EDUCATION                         :          JULY 7, 2003

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is scheduled for jury selection on August 1, 2003. On January 31, 2003, the defendant, Wethersfield Board of Education (Board), filed a motion for summary judgment with an accompanying memorandum for all nine counts of the plaintiff's Verified Complaint. The plaintiff filed a memorandum in opposition to defendant's motion for summary judgment dated March 18, 2003 and filed a substituted and more complete memorandum in opposition dated March 25, 2003. The matter was argued at short calendar on June 23, 2003. Prior to the short calendar argument the plaintiff, Thomas O'Connor, had filed a cross motion for partial summary judgment as to liability and a memorandum in support thereof dated June 18, 2003. The defendant subsequently filed a memorandum and objection to the cross motion dated June 23, 2003. At the short calendar on June 23, 2003, the parties did not directly argue the cross motion for partial summary judgment, however, the issues presented by that motion are common to the issues raised in the defendant's

SUPERIOR COURT
OFFICE OF THE CLERK

JUL 7 3 31 PM '03

EXHIBIT B

motion for summary judgment. While the matter has not been argued, in view of the time frame, the court will rule on both motions in this memorandum.

<u>FACTS</u>

Taking the facts in the light most favorable to the non-moving party on the defendant's motion for summary judgment, the court finds the following material facts:

1.    The plaintiff is a teacher in Wethersfield, Connecticut. He has been a teacher, and an employee of the Wethersfield Board of Education since 1982.

2.    The plaintiff has tenure under the Connecticut Teacher Tenure Act, General Statutes § 10-151.

3.    The plaintiff was put on administrative leave with pay on March 25, 1999.

4.    The Assistant Superintendent of Schools Robert Buganski and Attorney Gary Starr were assigned to conduct an investigation (Starr-Buganski investigation) into allegations that the plaintiff had engaged in unacceptable conduct..

5.    On March 29, 1999, the plaintiff's cardiologist, Dr. Fred Rubin, sent a letter to Buganski notifying him that the plaintiff, who had pre-existing coronary artery disease, was "very anxious and depressed" and "was complaining of chest pain again."

6.    As of October 22, 1999, the Starr-Buganski investigation was largely completed. The only thing preventing the plaintiff from returning to work was a question regarding the plaintiff's physical health. As a result, Buganski sent a letter to

-2-

the plaintiff asking the plaintiff to have a notification from Dr. Rubin certifying that plaintiff was fit to return to work.

7.    On October 25, 1999, Dr. Rubin wrote to Buganski and told him the plaintiff was fit to return to work, but that the doctor was concerned about the amount of anxiety that the plaintiff felt.

8.    On November 4, 1999, the Superintendent of Schools, Dr. Pierson, informed the plaintiff that plaintiff would return to work under a remediation plan.

9.    On November 5, 1999, Buganski wrote to the plaintiff informing him that "it appears that you are medically cleared to return to work . . . ."

10.    On or about December 6, 1999, a grievance hearing occurred in public session before the defendant. The plaintiff attended, along with approximately thirty five students and parents who supported the plaintiff. It was a raucous meeting at which the plaintiff and his supporters opposed the defendant's treatment of the plaintiff and demanded the opportunity to express their views.

11.    On December 7, 1999, the defendants ordered the plaintiff to undergo a psychiatric examination by Dr. Harold Schwartz, a psychiatrist at the Institute for Living. The plaintiff met with Dr. Schwartz and was instructed by the defendant to sign an "Authorization to Release Medical Records and Information" (Release). This authorization form not only gave Dr. Schwartz access to the plaintiff's medical records, but it also gave the same access to the defendant and any of its representatives.

-3-

12.     On January 4, 2000, t he plaintiff went to Dr. Schwartz and spent approximately two hours with him.  Dr. Schwartz told the plaintiff he should not have an expectation that what happens between them would be private.  The psychiatrist then inquired into plaintiff's parents' marital history; the lives and marriages of plaintiff's siblings; the events surrounding plaintiff's father's violent death; the incidence of alcoholism in plaintiff's family; and other personal and private details.

13.     At the conclusion of the session, Dr. Schwartz informed the plaintiff that he would have to return for more visits and that he would have to take psychological tests, including the Minnesota Multiphasic Personality Inventory (MMPI) test.  The plaintiff made an appointment to return to Dr. Schwartz but declined to sign the Release.

14.     Dr. Schwartz stated to the plaintiff that he wanted to review the record from Arms Acres, the alcohol rehabilitation facility that the plaintiff had gone to approximately thirteen years prior.

15.     The Arms Acres record consisted of 151 pages.  Disclosure of the information in this record was subject to the rules set forth in 42 C.F.R § 2.

16.     The records include a personal history worksheet with extremely detailed information concerning the plaintiff's background.

17.     The plaintiff claims that even if he had signed the Release, the defendant would not have been able to obtain the files it was seeking because the proposed Release did not conform to 42 C.F.R § 2.

-4-

18.     On January 20, 2000, the defendant sent a letter to the plaintiff through the plaintiff's attorney. The defendant again insisted that the plaintiff sign the Release.

19.     On January 24, 2000, Dr. Rubin informed Buganski that there were no physical or psychological impediments to the plaintiff's returning to work.

20.     On January 26, 2000, the plaintiff's primary care physician, Dr. Eric Shore, informed the defendant that "there is no reason to think that he is not medically fit to return to work."

21.     On January 28, 2000, the plaintiff brought a lawsuit against the defendant, which is the lawsuit currently pending in federal court.

22.     On February 1, 2000, the defendant informed the plaintiff that because the plaintiff had filed the lawsuit, the plaintiff could not return to Dr. Schwartz until the court issued a ruling on the injunction.

23.     On March 30, 2000, Dr. Les W. Smith, M.D., a board-certified psychiatrist, wrote and sent a brief report to the defendant stating that, "It is my opinion, with a reasonable degree of medical certainty, that [plaintiff] is not currently disabled by a psychiatric disorder and is able to return to work at this time."

24.     On March 8, 2000, the superintendent informed the plaintiff that he had been placed on sick leave status as of November 5, 1999 and his paychecks were actually his own accrued sick pay, notwithstanding that the plaintiff claimed that he was not sick.

25.     On November 30, 2000, the plaintiff's sick pay ran out.  From that point on, the plaintiff was paid no money at all.

26.     On December 4, 2000, the defendant's attorney sent a letter to the plaintiff's attorney reiterating that the defendant was still requiring the plaintiff to sign the Release.

27.     On March 29, 2001, in a conference with the federal judge, the defendants reiterated their demand that the plaintiff sign the authorization.

28.     The federal judge urged the parties to get the plaintiff back to work. Twenty three months after the defendant stopped paying the plaintiff's salary, the defendant allowed the plaintiff to see a psychiatrist chosen by the defendant, and without the plaintiff having to sign a medical release form that gave the defendant and its representatives access to the plaintiff's files.  Between October 19, 2001 and November 8, 2001, the plaintiff was seen by Dr. Howard Zonana, Professor of Psychiatry at Yale University Medical School.  Dr. Zonana saw the plaintiff for seven and one half hours over four separate days.  The plaintiff was also given psychological testing by Madelon Baranoski, Ph.D.  As part of the examination by Dr. Zonana, Dr. Zonana was supplied with the plaintiff's medical records including the Arms Acres file.

29.     Dr. Zonana concluded that the plaintiff did not have any psychiatric disability that would make it inappropriate for him to be in the classroom.

30.     On January 28, 2002, the plaintiff returned to full time teaching, and he began receiving a paycheck for the first time since November 30, 2000 and his first

-6-

regular salary check since November 5, 1999. During the period in which the plaintiff did not receive a paycheck the defendant did continue his medical insurance benefits.

31.    The plaintiff never refused to see a psychiatrist selected by the defendant. He did see Dr. Schwartz and was willing to return. He was also willing to sign an authorization form allowing the psychiatrist chosen by the defendant to have unrestricted access to his medical records, including the intensely private material in the Arms Acres file, but he was not willing to sign the defendant's Release which also gave the defendant and its administrators and representatives permission to view his medical records.

32.    The plaintiff maintains that Buganski admitted he wanted to pry into the plaintiff's private file.

## DISCUSSION

At the time of the short calendar argument, the plaintiff, with the agreement of the defendant, filed an amended complaint, which basically removed the first count of the original complaint, a now moot request for an injunction. Essentially, the defendant's motion for summary judgment is based upon claims either that various counts in the plaintiff's complaint fail to state a cause of action or that there are special defenses which block the claims as a matter of law. For the sake of clarity, the court will summarize the counts and defenses as they existed at the time of the filing

of the motion for summary judgment. The court recognizes that the counts will be renumbered when it rules on them because of the amended complaint. The claims and defenses facing the court are as follows:

1.     Count One (preliminary injunction) - Now removed from the case by agreement of the parties as moot.

2.     Count Two (breach of contract) - Barred: failure to exhaust administrative remedies, res judicata and failure to join bargaining unit as an indispensable party.

3.     Count Three (refusal to pay wages (General Statutes § 31-70)) - Barred: failure to exhaust his administrative remedies, res judicata and collateral estoppel.

4.     Count Four (wrongful constructive discharge) - Barred: failure to exhaust administrative remedies, collateral estoppel and failure to state a claim for which relief can be granted.

5.     Count Five (state constitutional claim) - Barred: failure to state a claim upon which relief may be granted.

6.     Count Six (negligent infliction of emotional harm) - Barred: failure to exhaust administrative remedies, collateral estoppel, governmental immunity (General Statutes § 52-557n(a) (2) (B)) and failure to state a claim upon which relief can be granted.

7.    Count Seven (intentional infliction of emotional distress) - Barred: failure to exhaust administrative remedies, collateral estoppel and governmental immunity.

8.    Count Eight (invasion of privacy) - Barred:  failure to exhaust administrative remedies, collateral estoppel, governmental immunity and failure to state a claim upon which relief can be granted.

9.    Count Nine (statutory violation of constitutional rights) - Barred: failure to state a claim upon which relief can be granted.

The defendant argues, with no citation of authority, that the plaintiff has failed to exhaust his administrative remedies because he did not move to vacate the arbitration award pursuant to General Statutes § 52-418 and 52-420.  The court finds no validity to this claim.  The plaintiff, in fact, exhausted the administrative remedies set forth in the teacher's contract.  There is no authority of which the court is aware that requires a motion to vacate an arbitration award as a prerequisite to exhaustion. In fact, such a proposition makes little sense in relation to the Connecticut jurisprudence on arbitration.  In addition, without engaging in extensive discussion, the court notes that the arbitration concerned the arbitrator's adjudication of the Board's compliance or non-compliance with the agreement between the Board and the Wethersfield Federation of Teachers CFEPE, AFT/AFL-CIO, dated September 1, 1998 through August 31, 2001 (Bargaining Unit Agreement).  There is nothing apparent in the extensive file which would seem to have given the plaintiff any

-9-

reasonable hope of succeeding under the standards set forth in General Statutes § 52-418, if he had attempted to vacate the award.[1]

Section 2.3 of the Bargaining Unit Agreement requires arbitration and Section 2.3.4 provides that "the decision of the arbitrator shall be final and binding." The court agrees with the defendant that to the extent that any of the plaintiff's claims were the subject of arbitration, the plaintiff may not re-litigate them. The court does not, however, agree with the defendant that all claims of the plaintiff were subject to the arbitration.

Clearly, the plaintiff had rights as a tenured teacher pursuant to the contract between the Wethersfield Bargaining Unit and the Board which were covered by the arbitration proceeding. Equally clearly, the plaintiff had rights pursuant to General Statutes § 10-151 as a tenured teacher and these rights, in the opinion of the court, are independent of matters which have to be arbitrated under the collective bargaining agreement.

---

[1] General Statutes § 52-418 provides in part that the superior court judge reviewing an applicant's motion to vacate "shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

The plaintiff also had rights which may be applicable to this matter under General Statutes § 31-51bb which provides:

> "No employee shall be denied the right to pursue, in a court of competent jurisdiction, a cause of action arising under the state or federal constitution or under a state statute solely because the employee is covered by a collective bargaining agreement. Nothing in this section shall be construed to give an employee the right to pursue a cause of action in a court of competent jurisdiction for breach of any provision of a collective bargaining agreement or other claims dependent upon the provisions of a collective bargaining agreement."

General Statutes § 31-51q may also be applicable to plaintiff's claim. That section makes an employer "including the state and any instrumentality of political subdivision thereof" liable for discipline or discharge of an employee on account of the employee's exercise of certain constitutional rights.

Mendillo v. Board of Education, 246 Conn. 456, 717 A.2d 1177 (1998), would support the proposition that the plaintiff may have a cause of action for wrongful termination in violation of General Statutes § 10-151(d) if he was terminated or constructively terminated. It is clear that in our case, the plaintiff was not terminated. Rather, he was suspended for an inordinately long period of time. The plaintiff is, therefore, not extended rights and procedures for termination required by §10-151(d). See Tucker v. Board of Education, 4 Conn. App. 87, 492 A.2d 839 (1985) (distinguishing suspension from termination and finding that an unreasonably long suspension without pay did not have the effect of a constructive termination or de facto termination to trigger a tenured teacher's rights under § 10-151). See also, LaCroix v. Board of Education, 199 Conn. 70, 78, 505 A.2d 1233 (1986) (a tenured

teacher's challenge of wrongful discharge is governed by and limited to the statutory appeal process provided by 10-151(f)). The <u>Mendillo</u> case presented the common situation where an employee resigns, but claims her resignation was forced by the inappropriate actions of the defendant. In <u>Mendillo</u> the court specifically held:

> "We conclude that the plaintiff's claim of constructive discharge, as alleged in her substitute complaint, falls within the exception to the exhaustion doctrine."

<u>Mendillo v. Board of Education</u>, supra, 246 Conn. 464. The difference between the plaintiff's situation and the <u>Mendillo</u> situation is that the plaintiff did not resign his position.[2] The court can find no case where a remedy was granted for wrongful constructive termination under the Teacher Tenure Act where the teacher continued to be employed. The court is not convinced that the existing Connecticut law supports the plaintiff's claim that two years without pay, during which benefits were being received, is the equivalent of constructive termination. This issue is revisited below in Count Three.

In light of the foregoing and the following discussion of the elements of particular courses of action and the application of governmental immunity referring to the counts of the Amended Complaint dated June 10, 2003, the court rules as follows:

<u>Count One - Breach of Contract</u>

As to Count One, the defendant's motion for summary judgment is granted. To the extent that the plaintiff's claim is based on the contract between the bargaining

---

[2] The court is aware that the plaintiff has recently resigned, however, this fact is not relevant to the dispute before this court.

unit and the Board, as was mentioned, those claims have been finally determined by the arbitration. The unchallenged determination by the arbitrator's finding was that the defendant did not violate Article 5.1 (sick-leave) and/or Article 14.4 (discipline) of the Bargaining Unit Agreement when the defendant "placed the [plaintiff] on paid sick leave effective November 5, 1999" or "on unpaid sick leave (no salary, but with health insurance benefits) on and since December 1, 2000." Again, while the court agrees with the plaintiff that he would have a cause of action under Mendillo, notwithstanding the arbitration award, if he had been discharged or constructively discharged, the plaintiff has cited no authority and the court can find none which convinces it that a constructive discharge occurred.

### The Second Count - Refusal to Pay Wages

The court agrees that there may have been an independent duty to pay wages if there had been a discharge, however, the arbitrator specifically found that there was no violation of Section 14.4 and the court finds, as mentioned above, that there was no discharge nor constructive discharge. In addition, the court notes that the definition of wages contained in General Statutes § 31-71a defines wages to mean "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." While the plaintiff may have been denied the opportunity to earn wages, it does not appear to the court that he was denied wages within this definition. Accordingly, defendant's motion for summary judgment is granted as to Count Two.

-13-

## Count Three - Wrongful Constructive Discharge

The defendant's motion for summary judgment as to Count Three, breach by constructive discharge, is granted for the reasons set forth in the discussion of Count One. Although a mere reading of the pleading might lead one to believe that the First Count was based upon the bargaining unit's contract and the Third Count based on the Teacher Tenure Act, in fact, at argument it was clear that both the First and Third Counts are based upon a constructive discharge under the Teacher Tenure Act, whether or not applicable under the bargaining unit's contract.

In ruling on the First Count, the court found no constructive discharge, however, it is appropriate to explore that concept in more detail at this point.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Brittell v. Department of Corrections, 247 Conn. 148, 178, 717 A.2d 1254 (1998). The concept of constructive discharge arose to balance the inequities faced by employees who quit because of intolerable working conditions. Id. Constructive discharge allows a plaintiff to maintain his employment discrimination claim even though the plaintiff quit. Id. The disputes before the court does not rise to the level a constructive discharge under our law. Summary judgment is granted as to Count Three.

## Fourth Count - State's Constitutional Claims

The court recognizes that the Connecticut Supreme Court has consistently looked at Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,

-14-

403 U.S. 388, 29 L. Ed.2d 619 (1971) and its federal progeny as a guide in

determining whether to create a <u>Bivens</u> action for an alleged state constitutional

violation. Such a cause of action has been recognized in Connecticut in <u>Binette v.</u>

<u>Sabo,</u> 244 Conn. 23, 710 A.2d 688 (1998). In <u>Binette</u> the court held:

> "Our decision to recognize a . . . remedy in this case does not mean that a
> constitutional cause of action exists for every violation of our state's
> constitution....whether to recognize a cause of action for alleged violations of
> other state constitutional provisions in the future must be determined on a case
> by case basis."

Id., 47-48.

This court need not enter the confusing maze of whether a <u>Bivens</u> action lies

in the instant matter. The only defendant in the present case is the Wethersfield

Board of Education. The court agrees with the defendant and adopts the reasoning of

the Superior Court judge in <u>Aselton v. Town of East Hartford</u>, Superior Court,

judicial district of Tolland, Docket No. X-01-CV01 0079187<u>S</u> (December 3, 2002,

*Sferrazza, J.*). The court recognizes that in <u>Aselton</u>, Judge Sferrazza relied on <u>FDIC</u>

<u>v. Meyer</u>, 510 U.S. 471, 485-86, 127 L. Ed.2d 308 (1994). In <u>FDIC</u> the United States

Supreme Court held that a <u>Bivens</u> action could not be maintained against a federal

agency. The plaintiff would argue that <u>FDIC</u> was inapplicable to <u>Aselton</u> and that

<u>Aselton</u> was wrongly decided because the federal government had sovereign

immunity while the Board of Education has merely the immunity of a municipality,

which is somewhat less. Notwithstanding this argument, the court believes that the

reasoning in <u>Aselton</u> supports the conclusion that a <u>Bivens</u> action may not be brought

-15-

directly against a governmental entity.  Summary judgment is granted as to the Fourth Count.

### Fifth Count - Negligent Infliction of Emotional Harm

A plaintiff may bring an action for negligent infliction of emotional distress when there are facts showing that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that the distress caused might result in illness or bodily harm.  Parsons v. United Technology Corp., 243 Conn. 66, 88, 700 A.2d 655 (1997).  The court holds that this claim presents an issue of fact.  It appears to the court that a jury could conclude that requiring extensive records concerning a thirteen-year-old treatment for alcohol abuse at a time when there were no current claims concerning alcohol was unreasonable conduct.  Further, notwithstanding the defendant's claim of immunity, while the court agrees that the action in question was a discretionary action, the court agrees with the plaintiff that this matter could be found to be within the exception set forth in Colon v. City of New Haven, 60 Conn. App. 178, 758 A.2d 900, cert. denied, 255 Conn. 908, 763 A.2d 1034 (2000).  Colon held that immunity is not available when an identifiable person is subject to imminent harm.  The action complained of here was clearly directed only against the plaintiff, an identifiable person, not a large mass of possible victims as in Aselton.  The motion for summary judgment is denied as to the Count Five.

-16-

The Sixth Count - Intentional Infliction of Emotional Distress

A plaintiff states a cause of action for intentional infliction of emotional distress when it can show:

> "(1) That the actor intended to inflict emotional distress or that he knew or should have known that the emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986).

Whether the defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court. Bell v. Board of Education, 55 Conn. App. 400, 410, 739 A.2d 321 (1999). But when, as in this court's opinion here, reasonable minds may disagree, it becomes an issue for the jury. The court recognizes that General Statutes § 52-557n (a) (2) provides:

> "[A] political subdivision of the state shall not be liable for damages to persons or property caused by:  (a) acts or omissions of any employee, officer or agent which constitutes criminal conduct, fraud, actual malice or wilful misconduct."

The court holds that a jury could conclude that the elements of a claim of intentional infliction of emotional distress were proven by the plaintiff while at the same time finding that the defendant was not guilty of the types of act which would exclude a subdivision of the state from liability under the statute, namely acts constituting criminal conduct, fraud, actual malice or wilful misconduct.  The motion for summary judgment is denied as to Count Six.

-17-

<u>The Seventh Count - Tortious Invasion of Privacy</u>

The Connecticut Appellate Courts have not addressed an intrusion on

seclusion claim as set forth in § 652b of the Restatement (Second) of Torts (1977).  A

trial court appears to have given an acceptable working definition of the cause of

action in the following language:

> "One who intentionally intrudes, physically or otherwise, upon the solitude or
> seclusion of another or his private affairs or concerns, is subject to liability to
> the other for invasion of privacy, if the intrusion would be highly offensive to
> a reasonable person."

(Quotation marks omitted.)  <u>Flowers v. New Britain General Hospital</u>, Superior

Court, judicial district of Hartford, Docket No. CV 910393885 (June 13, 1994,

*Hennessey, J.*).

The defendant argues that there was no "intentional intrusion" in this case and

further claims that because it relied upon the advice of counsel it is excused from any

claim for the tort of invasion of privacy.  The defendant cites no authority for this

proposition which appears to have its antecedents in the jurisprudence of vexatious

litigation.  The motion for summary judgment as to Count Seven is denied.

<u>Count Eight - Claim Under Connecticut General Statutes § 31-51q</u>

It appears that a jury could reasonably conclude that the plaintiff was

disciplined for engaging in a protected constitutional activity involving free speech,

the right of privacy and freedom to seek redress for grievances.  While some of these

matters might appear to be within the arbitration proceeding, which would otherwise

-18-

be res judicata, these also appear to be the type of rights protected by § 31-51(b)(b).

Accordingly, the motion for summary judgment as to Count Eight is denied.

<u>Plaintiff's Cross Motion for Partial Summary Judgment as to Liability</u>

Recognizing that this matter is set for jury selection on August 1st of this year, the court finds it appropriate to rule on the cross motion for summary judgment notwithstanding the fact that the matter has not been argued. The court acknowledges the procedural argument against a such a decision on this matter made by the defendant which may have some merit. However, because the court is prepared to deny the cross motion for summary judgment as to each count involved, the court believes that it will make the trial of the matter more predictable to the parties by ruling at this time.

The plaintiff has moved for summary judgment as to liability on breach of contract and on failure to pay wages. Because the court has this day granted summary judgment for the defendant on both the breach of contract and the construction discharge breach of contract counts, as well as the claim for failure to pay wages, the plaintiff's cross motion for summary judgment as to liability is denied for the reasons set forth herein.

BY THE COURT

Kevin E. Booth, J.