STATE OF CONNECTICUT

SUPERIOR COURT

HARTFORD JUDICIAL DISTRICT

SEPTEMBER 10, 2003

| | |
|---|---|
| THOMAS O'CONNOR<br>VS.<br>WETHERSFIELD BOARD OF EDUCATION | DOCKET NO.<br>CV01-0808376S |

B E F O R E: THE HONORABLE KEVIN E. BOOTH, JUDGE

A P P E A R A N C E S:

ATTORNEY LEON ROSENBLATT
Representing the Plaintiff

ATTORNEY MICHAEL ROSE
ATTORNEY ALEXANDRIA VOCCIO
Representing the Defendant

TRANSCRIBED BY: Connie D. Fendley
Court Monitor

EXHIBIT D

notes if doing so will aid your memory. You should not make any notes outside of the courtroom and bring them here. Your notebook will be collected at the end of each day and kept secure by the clerk. You should not take your notebooks out during the breaks or during the lunch hour. They should stay in the jury room. I take notes because I may be asked to rule on issues during the course of the trial but I don't have to make a decision at the end as to what the facts were. Your decision whether to take notes at any point is up to you. If you take notes, please don't disclose your notes to anyone during the trial, and it will be up to you whether you want to disclose them to your fellow jurors during deliberation at the end of the trial. So those are the rules on note taking. Obviously, the note taking should be only in the courtroom. They should stay here. You should not share them with each other during the trial. It's optional at the end of the trial whether you want to share your notes, and your primary job for the next how many days you're here is to evaluate the witnesses, and so while some people it helpful to take notes, you shouldn't take them at the expense of being able to make a decision as to what you think of the testimony.

That concludes my preliminary introduction. We'll start with opening arguments. The plaintiff gets to go first. Attorney Rosenblatt.

ATTORNEY ROSENBLATT: Thank you, your Honor. I'm going to come over here and peer into the glare behind

you.

This case is primarily a case about the right of privacy to certain medical information. The plaintiff is Thomas O'Connor. He was a teacher in Wethersfield. He taught English for about seventeen years, since 1982. He was a tenured teacher, and you'll hear some evidence about that. Under the tenure laws in Connecticut, a tenured teacher cannot be fired except for certain specified reasons, and if those reasons are supposed to exist, there's a whole elaborate process where a teacher has a right to a lawyer and there's a hearing and a decision-maker. You will hear evidence in this case that none of that happened. There was no attempt to terminate Mr. O'Connor.

Mr. O'Connor was put out on administrative leave on March 24, 1999, administrative leave with pay. For purposes of this lawsuit, it does not matter in the slightest why he was put out on administrative leave. The reasons are completely irrelevant because this case arises after that. It's our contention that it's irrelevant because Mr. O'Connor and any tenured teacher has the same rights no matter who he is, no matter what he's done if anything. So it just doesn't matter from our point of view. You don't have to be a saint to have certain rights.

Now, as I said, he was put out on administrative leave in March of 1999 and an investigation was begun. It was done by a man named Robert Buganski, who was the assistant superintendent of schools in Wethersfield. He

will figure prominently in this case. I believe he will testify this afternoon. We're going to take him out of turn a little bit because, evidently, he needs to go out of town after today.

So let me give you some important background. First, Mr. O'Connor is a recovering alcoholic. He went into rehab in 1988, about eleven years before any of the events of this case, and there has never been a suggestion that his being a recovering alcoholic has anything to do with anything in this case. He's been in sobriety since then, and no one has ever contended otherwise.

A second background point is that Mr. O'Connor has had serious coronary artery disease. In 1996, he had a coronary bypass operation. So now let me return to 1999.

When he went out on administrative leave with pay, he was being investigated. He was under considerable stress and he called his doctor, his cardiologist, who's name is Fred Rubin. He practices in Hartford, and I expect that he will testify in this trial. You will also see documents written by Dr. Rubin. Dr. Rubin notified Mr. Buganski, the assistant superintendent, about what was going on with him and his physical health; namely, the stress was causing chest pains.

Seven months after this administrative leave started, the investigation ended, and Mr. O'Connor was told to get ready to come back to work. This wasn't a termination. He wasn't terminated. He was coming back to

work. Dr. Rubin wrote to Mr. Buganski and told Mr. Buganski that Mr. O'Connor was fit to return to work although he was concerned about the amount of anxiety that he would be experiencing on the job.

At any rate, this is in November of 1999. The letter actually was in late October. By November 5, 1999, he was ready to come back to work. Everything was cleared. He was not called back to work in November.

In December 1999, there was a school board meeting. It was attended by Mr. O'Connor and a large number of people who were students and parents who supported Mr. O'Connor. And on December 10, 1999, Mr. O'Connor was given an order by the superintendent of schools whose name is Lynne Pierson, Dr. Lynne Pierson. She wrote him a letter ordering him to go to a psychiatric examination. She ordered him to call up Dr. Harold Schwartz, who is the head of the Institute of Living, and set up an appointment and go see him. With this letter, Mr. O'Connor was given an authorization form and he was told to sign it. And this authorization form, if he had signed it, would have released to Dr. Schwartz all of his medical records without restriction, all, specifically including the records from the alcohol rehab treatment. By the way, the name of that place is Arms Acres.

So he was sent this authorization form. He did not sign it, but he did go to Dr. Schwartz and he did that in early January 2000. Importantly, that authorization form not only gave the psychiatrist the right to see all his

medical records, including the Arms Acres file, it would have given the superintendent the right to see them all, the assistant superintendent, all the members of the board of education, including former students of Mr. O'Connor. Anyone who was a representative of the Wethersfield Board of Education would have had access to all of his medical records.

So Mr. O'Connor did go to Dr. Schwartz. Dr. Schwartz asked him about a variety of things: his parents, marital history, his father's death, the incidents of alcoholism in his family, what his sisters were like as grown ups. This lasted for two hours. At the end of that, he was told by Dr. Schwartz he had to come back for more interviews and to take a battery of psychiatric tests, including the MMPI, and he was told again to sign this authorization form releasing all of his medical records, including the Arms Acres file, and releasing them to Dr. Schwartz and everyone who is a representative of the Wethersfield Board of Education.

Well, this was too much. Up until that point, Mr. O'Connor had cooperated. He had made an appointment to return to Dr. Schwarz. He cancelled that appointment. Then he was told he would be insubordinate. He would be deemed insubordinate if he did not return to Dr. Schwartz and sign that form. So he made another appointment with Dr. Schwartz but he would not sign that form. He never signed that form. And he brought a lawsuit. After he brought that lawsuit, he

was told by Dr. Pierson that she cancelled that second appointment with Dr. Schwartz.

The evidence you will hear is that this, at that point, left Mr. O'Connor out of work with nothing that he could do. He was being told to sign this authorization form. He did not want to. He felt he didn't have to. And he had filed a lawsuit, and as a result of that, he could not go back to Dr. Schwartz; he could not go back to work; he was just out there even though he was a tenured teacher.

As it turned out, he was out of work for more than two years. His pay was cut off. Eventually, the Wethersfield Board of Education relented and allowed him to go to another psychiatrist who did not insist on his signing this release that would release everything to the board of education, to his employer, and he did go to that psychiatrist, and he was allowed to go back to work and he went back to work. But he was out of work in the meantime for more than two years. This caused him great humiliation, great stress, serious loss of income; and at the conclusion of this case, I will ask you to consider the damages that Mr. O'Connor suffered and I will ask you to award fair and just compensation to him. Thank you.

THE COURT: Thank you, Mr. Rosenblatt. The defense counsel, Mr. Rose.

ATTORNEY ROSE: May it please the Court, your Honor, ladies and gentlemen of the jury. This is not a case about privacy of medical records. This is a case about

kids. This is a case about what we do to protect kids. It's a case about obligations that the Wethersfield Board of Education has to insure that its teachers are fit to teach kids. The kids can't be here today. We'll be here today. But I ask you to consider that this case is about the responsibilities of the superintendent when parents are not at school to make sure that the teachers who teach those children are fit to perform the functions of the job that they're hired for.

When we see acts of violence or malfeasance in the news, we ask why did that happen; why couldn't something have been done. This case is about a board of education that attempted to do something; and as you will see, as Mr. O'Connor's attorney mentioned, with the tenured status, oftentimes that is very difficult to do. In some ways, the case is about the balancing of the rights of the individual with the balancing of the rights of the children.

Now, in Wethersfield in this case, we did do something. After witnessing, what you will hear about, years of deteriorating relationships with Mr. O'Connor, you will hear about the events that got Mr. O'Connor placed on administrative leave. The administration decided that it needed to do something. It was enough of a concern that it had about Mr. O'Connor's mental stability that it needed to send him to a psychiatrist.

Mr. O'Connor, the evidence will show, did not cooperate with that request. You will see evidence; you

will see documents; you will see a copy of Mr. O'Connor's own lawsuit, which is not this lawsuit -- it's another lawsuit that's in federal court -- you will see a copy of that in which Mr. O'Connor was not advancing cooperation. In that lawsuit, as a matter of fact, he requested an injunction preventing the board of education from sending him to the psychiatrist. Clearly, from the very beginning, he did not cooperate.

Now, in order to evaluate what Wethersfield did, you need a little bit more background than that which was given to you. And the purpose of an opening statement is not to tell you everything that you will see in evidence, but you will see some significant amount of testimony which relates to Mr. O'Connor's background.

One of the first people that you will hear from in the defendant's case, which will be separate from the plaintiff's case, will be Dr. Lynne Pierson, who's the superintendent of schools in Wethersfield. She served there from 1995 through 2002. And she will tell you about her direct experiences with Thomas O'Connor during that period. She will tell you about situations in which he wrote letters to her which contained obscene language which I will not even address in opening statement. She will talk about how the first she met him, he ripped opened his shirt to show her his cardiovascular scars. So from the beginning, Dr. Pierson had a question about this gentleman's fitness and his ability to work within a classroom setting. She will

also tell you about Mr. O'Connor's reputation in the community, in that school. She will tell you about the conflicts that she observed firsthand or heard secondhand. She will tell you about his reputation for outbursts. She will tell you about the concerns that students and faculty had about Thomas O'Connor's fitness to teach.

Now, the evidence in this case will show that in March 1999, this came to a head. Now, Attorney Rosenblatt has indicated to you that he thinks what happened in March of 1999 is irrelevant; but if you're being asked to judge whether or not it was reasonable for us to send Mr. O'Connor to a psychiatrist, it certainly is relevant what happened in March 1999 and the events that got Mr. O'Connor placed on administrative leave.

Now, again, I'm not going to go into intricate detail at this point. I will tell you that some of those allegations range from Mr. O'Connor swearing at a student in class; ridiculing another student in class; indicating to a class of students that one young child masturbated with a piece of gym equipment. Those were the events that got Mr. O'Connor placed on administrative leave.

Now, you will also hear that Mr. O'Connor was paid during that entire process. The board conducted an investigation and hired an outside law firm called Shipman & Goodwin to come in. They interviewed over twenty witnesses. They worked with Mr. Buganski. And some of the allegations were corroborated; some were not. Mr. O'Connor admitted

some inappropriate activities; some he did not. But the evidence is uncontradicted that there were problems going to that March of 1999.

Now, as Mr. Rosenblatt mentioned to you, tenure, in this state, prevents the board of education from terminating an employee that it might otherwise want to terminate. The evidence will show that after this investigation was done, September 1999, the board had a choice, and the choice was: do we take Thomas O'Connor back under a last-chance arrangement or --

ATTORNEY ROSENBLATT: Your Honor, I object. I think this has got nothing to do with the case.

THE COURT: Overruled. I'll allow it in argument.

ATTORNEY ROSE: They were faced with the choice and, the choice was: do we take this man back knowing what we know about him or do we begin the termination process. And the superintendent decided to bring him back. Reasonably, perhaps. Graciously. She chose to give Tom O'Connor one last chance. But there was a wrinkle.

The evidence will show you back in the fall of 1999, Mr. O'Connor's own physician raised his mental health as an issue. Now, we've known about the history; we've known about the March '99 events. And then we get a letter from Dr. Fred Rubin which did not clear him to return to work. It did say (as read): "I am neither Mr. O'Connor's psychiatrist nor his general physician, so I direct any further inquiries on these topics to his doctors." That

letter came on October 25th.

Now, as Attorney Rosenblatt told you, we did -- the board of education did write him a letter back that said we expect you to come back to work, but you have to come back subject to a mediation plan and we need a full release, release meaning from your physician. Attorney Rosenblatt didn't tell you that two days later, Mr. O'Connor himself wrote a letter that said, I'm going to see Dr. Rubin again in three weeks on November 22nd. You'll see that letter, Mr. O'Connor's own letter. So he wasn't ready, willing, and able to return to work in early November.

We never heard from him again, not on the 23rd of November, not on the 24th of November. We didn't hear from him. And at some point, Lynne Pierson, superintendent of schools, became concerned. She saw enough red flags. She talked to her lawyers and she said what can we do. She will testify in evidence that the lawyers advised her she could send Mr. O'Connor to a psychiatric IME. She could ask a psychiatrist of her choosing to determine whether or not Tom O'Connor was fit to teach or whether there was some problem that she needed to know about. Maybe he could be accommodated; maybe he needed a further leave of absence.

It is our contention that far from being an issue of privacy, the issue that we had was a moral and legal obligation to insure that Tom O'Connor was fit for duty.

Now, the plaintiff's case, what the plaintiff will attempt to show you is that the board, acting through Dr.

Pierson, the superintendent of schools, acted unreasonably, that they were voyeurs, that they were interested in the seedy details of Tom O'Connor's life for no reason other than perhaps pure interest. It's our contention, and the evidence will show, that the board of education wanted him to go to a psychiatrist and that psychiatrist asked for the records. Dr. Schwartz will testify that he asked for these records because he thought that would allow him to have the best foundation for an eventual opinion. Human beings have memories that alter over time. They tend to shade things in gray. But the records, those are the best evidence of somebody's baseline, and that's why Dr. Schwartz wanted those records.

Now, far from cooperating, as you heard in opening statement, the evidence will show you that Mr. O'Connor fought this request immediately. This isn't about a release. He brought a lawsuit saying that you have no right to send me to a psychiatric IME. We'll introduce a letter from his lawyer to the Wethersfield Board of Education back in December of 1999 that said you don't have a right to send my client to a psychiatric IME, and then he brought the lawsuit.

Now, it's interesting in that lawsuit, which I will introduce into evidence -- this is the different lawsuit that's over in federal court -- what Mr. O'Connor asked for was an injunction to prevent him from going to the IME. He didn't want to go. He wanted the Court to rule as a matter

of law that the Wethersfield Board of Education did not have the right to send him to a psychiatric IME to determine whether or not he was fit for duty. So what did the Wethersfield Board of Education do? We agreed. We said if you don't want to go to an IME and you're filing an injunction, we'll cancel the IME and we'll let the legal process go forward. Ironically, that is one of the grounds that we are now in this second lawsuit being sued for. Mr. O'Connor's saying that we locked him out, that we wouldn't let him go to the IME, that he wanted to go to the IME. Well, you'll see the evidence shows you something quite to the contrary.

There are three counts. This isn't simply a case in a vacuum. There are three counts that this gentleman sued the Wethersfield Board of Education for: one, is invasion of privacy. So what he's asking you, through the Court, to determine is whether or not the Wethersfield Board of Education unreasonably intruded into his private seclusion, whether he as an individual have privacy rights that supercede the rights that the board would have to insure his fitness for duty. That is one element of this case. That's invasion of privacy. We believe that the evidence will show that Wethersfield had more than reasonable cause to send him to this IME. They had more than reasonable cause to ask him to cooperate with Dr. Schwartz.

The second theory that Mr. O'Connor has sued the

board for is intentional infliction of emotional distress. He's asking for money damages because he believes that the board intended to harm him during this period. The evidence will show that certainly is not the case. One of the elements of that case which you'll be asked to consider during the charging conference is extreme and outrageous conduct. We submit to you that the evidence will show that there was nothing in our conduct that was extreme and outrageous. It was exceptionally reasonable under the circumstance.

Now, the final claim is one in which Mr. O'Connor claims that we violated his First Amendment rights. Now, the evidence will show that claim lacks merit as well. Mr. O'Connor, and through his opening, he indicated to you that he filed this grievance and, in the grievance, he spoke out on his rights. He wanted to be free to speak out and talk about things. And then the next day, we sent him a letter that said you have to go see Dr. Schwartz. And I think the assertion is is that, well, we retaliated against you for speaking out the night before. The problem is Mr. O'Connor has his date's wrong. The meeting, the evidence will show, was on December 8th. We sent him a letter sending to Dr. Schwartz on December 7th. Those are the three counts that you're being asked to consider.

Now, you're also -- to the extent that you find for the plaintiff on any of those counts, you're going to be asked to determine what are damages. And the basis of this

claim is emotional stress. Mr. O'Connor is claiming that those two months of partially paid leave -- those two years of partially paid leave caused him great emotional distress. Well, we're going to give you evidence that shows you his emotional condition before this. We're going to show you how he was in 1991, 1993, 1995. Again, we're going to go to the correspondence that he was writing in which he claimed he was always undergoing a hostile environment, claiming sexual harassment, all sorts of things. So we're going to show you that before this, Mr. O'Connor had serious emotional distress. And I know that plaintiff's counsel is going to end his theory with the day that Mr. O'Connor returned to work. So we can't consider any emotional distress after that.

Now, one of the facts that I think is important for you to consider as you hear the evidence is that Mr. O'Connor did eventually return to work, and the evidence will show that he only lasted at Wethersfield for six weeks and then he resigned.

The question to you, ladies and gentlemen, is did Mr. O'Connor cooperate or did he obstruct? Did the board act reasonably or did it act unreasonably? For each of the counts that I discussed with you, I will be asking you for a defendant's verdict at the close of this case. I will be asking you when you make your determination in this case that what the superintendent of schools did is reasonable, that she has a duty, an obligation to balance the rights of

students and her teachers, and in this case, she balanced those rights appropriately. Thank you.

THE COURT: Ladies and gentlemen, I believe that both counsel, and I know defense counsel, referred to an IME. I don't think anybody told you what that meant. It's common to lawyers. The letters stand for independent medical exam, and that's what they're talking about.

We are now ready to begin evidence. I'll ask Mr. Rosenblatt to call his first witness. And I would tell the members of the jury if at any time during the case you cannot hear a witness, just raise your hand, and we'll try to get the witnesses to speak up. Thank you.

ATTORNEY ROSENBLATT: Your Honor, I'll call Thomas O'Connor.

THE COURT: All right.

(The witness took the stand.)

THE CLERK: Please raise your right hand. You solemnly swear or solemnly and sincerely affirm, as the case may be, that the evidence you shall give concerning this case shall be the truth, the whole truth, and nothing but the truth so help you God or upon penalty of perjury?

MR. O'CONNOR: Yes, I do.

THE CLERK: Please state your name and address for the record spelling your last name.

CERTIFICATION

I hereby certify the foregoing is a true and accurate transcript of the tape-recorded proceedings taken by me in Docket No. CV01-0808376, Thomas O'Connor vs. Wethersfield Board of Education, heard before the Honorable Kevin E. Booth, Judge of the Hartford Judicial District on the 10th day of September 2003 at Hartford.

Dated this 20th day of February 2004 at Hartford.

Connie D. Fendley
Court Monitor