1

STATE OF CONNECTICUT

SUPERIOR COURT

HARTFORD JUDICIAL DISTRICT

SEPTEMBER 18, 2003

| | |
|---|---|
| THOMAS O'CONNOR<br><br>VS.<br><br>WETHERSFIELD BOARD OF EDUCATION | DOCKET NO.<br>CV01-0808376S |

B E F O R E: THE HONORABLE KEVIN E. BOOTH, JUDGE

A P P E A R A N C E S:

  ATTORNEY LEON ROSENBLATT
    Representing the Plaintiff

  ATTORNEY MICHAEL ROSE
  ATTORNEY ALEXANDRIA VOCCIO
    Representing the Defendant

TRANSCRIBED BY: Connie D. Fendley
Court Monitor

EXHIBIT E

3

1  of education to Mr. O'Connor; and if you do decide
2  that there's liability on one or more of his three
3  claims, then I will give you some separate
4  instructions, and you will have a somewhat briefer
5  argument on how much money might be due. But we'll
6  take up that after you've decided whether there's
7  liability on one, two, or three of the claims.
8      With that, we'll start the argument with the
9  plaintiff's counsel, Attorney Rosenblatt.
10     ATTORNEY ROSENBLATT: Thank you, your Honor. I'd
11 like to reserve about ten minutes.
12     THE COURT: Fine.
13     ATTORNEY ROSENBLATT: Thank you.
14     Good morning. On January 4, 2000, Thomas O'Connor
15 went to Dr. Schwartz. He didn't want to go but he did go,
16 and he participated in the session. He answered all of Dr.
17 Schwartz's questions. He talked to Dr. Schwartz about the
18 relationship between his mother and his father, his father's
19 early death, whether his father was an alcoholic, whether
20 his sisters were alcoholics, how they grew up, how he grew
21 up, their lives, their loves, their most intimate details.
22 They didn't talk about teaching. But Dr. Schwartz inquired
23 about all those extremely private things; and even though
24 Mr. O'Connor didn't want to be there, he answered those
25 questions.
26     Mr. O'Connor also talked about his experience as a
27 recovering alcoholic, his treatment, I think eleven or

4

1  twelve years previously at Arms Acres. At the end of all
2  that, Dr. Schwartz told him that he had no expectation of
3  confidentiality, that everything that Mr. O'Connor was
4  telling Dr. Schwartz would and could be told to Dr. Pierson.
5  It was like he was talking to Dr. Pierson directly. At that
6  point, it clearly was troubling to Mr. O'Connor.
7       Dr. Schwartz handed Mr. O'Connor a couple of those
8  releases. You have them in the record. They're Exhibit 6.
9  You will have all of this stuff in the jury room. This is
10 the release. I've shown this to you many times. This is
11 the general release. Dr. Pierson acknowledged that this was
12 a general release. Dr. Schwartz gave Mr. O'Connor some
13 copies of that. He had already received this lease which he
14 had not signed. Dr. Schwartz told him to sign them and that
15 he would be coming back for extensive testing, more
16 interviews.
17      We're not contesting in this lawsuit that Mr.
18 O'Connor went to Dr. Schwartz. I mean, he didn't want to
19 go. Nobody would want to go, but he went. The issue here
20 is the level of confidentiality. If Mr. O'Connor had gone
21 to Dr. Schwartz like he did to Dr. Zanana two years later,
22 and if he could talk to somebody knowing that what he said
23 was confidential, we wouldn't be here. But that opportunity
24 was never provided to him.
25      This release is in many ways certainly a key piece
26 of evidence. As I said, it was a general, is a general
27 release. It quite explicitly was a release in favor of the

5

1  board of education, any of their representatives. Dr.
2  Pierson admitted that she would get to see it. Mr. Buganski
3  said he would probably read the files. In his deposition,
4  he said he probably would. When he was here on the stand,
5  he said he might. But at any rate, he would have the right
6  to. All the other representatives would have the right to.
7  The members of the board of education would have the right
8  to, some of whom were Mr. O'Connor's former students. If he
9  had signed this release, he would have given up privacy all
10 together, and this was the condition of his going back to
11 Dr. Schwartz and completing that particular examination.
12         Now, when you're alone or in the jury room, I'd
13 like you to think about the concept in the United States of
14 America of someone at the risk of losing their job having to
15 sign this. The employer, and in this case the government,
16 says to someone -- imagine yourself in that situation -- you
17 have to sign this. If you don't sign this, we're going to
18 keep you out of work. I think that you would consider that
19 to be outrageous. That's not what you do in a civilized
20 society. Our country is built upon the sanctity of the
21 individual. We cherish the right of privacy, and this
22 eliminates the right of privacy.
23         Compare this release to all the other releases that
24 we've seen in the file, and there have been several. Keep
25 in mind that every page of the Arms Acres file was stamped -
26 - you'll have it with you -- was stamped with a warning that
27 this is confidential, that it's protected by a Federal

6

1  Regulation 42CFR Part II, that a general release does not
2  suffice to get this kind of information. These are laws --
3  our government has passed laws protecting the privacy of
4  certain records. Every page is stamped with this warning.
5       In the other releases in this case, you've seen
6  that every release that is legitimate is fundamentally
7  different. This here is the release that Dr. Zanana used,
8  Yale University. Note that it is from Thomas O'Connor. It
9  names -- yes -- it names a particular individual. It's not
10 addressed to general entities like the board of education.
11 It's addressed to a particular individual, not to their
12 representatives. Certain things are allowed, very specific
13 things. If they're not checked, they're not allowed.
14 There's an expiration date. This one happens to be sixty
15 days. So that if somebody signed this thing, it doesn't
16 just hang around for years and someone later says, Oh,
17 here's a signed release. I think I'll get some information.
18 This is the Yale University one. It is restricted.
19      This is a blowup of the Institute of Living
20 release. It's, I believe, Exhibit 22. This is the one that
21 Dr. Schwartz had. This is what they used: Institute of
22 Living. It's the same thing, the same format. Particular
23 purposes: You get to delineate what you get to release and
24 what you want to keep confidential. This one has a one-year
25 expiration date. It's very particular.
26      The Arms Acres file is exactly the same -- the Arms
27 Acres release. Exhibit PPP, you'll see this is the release

7

1  from the Arms Acres file that went to Mr. Sugrue, the crisis
2  counselor at the Wethersfield Board of Education. Here's
3  the stamp, the warning. It's to Mr. Sugrue. Particular
4  things are checked off. Notably, the psycho social
5  assessment is not checked. This information which is
6  withheld, and that is always in the control of Thomas
7  O'Connor. He gets to decide who can have this. There's
8  another warning on here. There's an expiration date. The
9  forms that are legal have a particular format. This general
10 release is a radically different document. I submit that if
11 any one of you or your spouses or anyone close to you ever
12 came to you and said my boss gave me this or I just applied
13 for a job and they want me to sign this, I submit that
14 everyone you and virtually everyone in America would say
15 that's an outrageous demand.
16          ATTORNEY ROSE:  Your Honor --
17          THE COURT:  Counsel --
18          ATTORNEY ROSE:  Your Honor, I don't mean to
19      interrupt --
20          THE COURT:  -- be careful about personalizing with
21      what you would do, Golden Rule-type problem.
22          ATTORNEY ROSE:  Thank you, your Honor.
23          ATTORNEY ROSENBLATT:  Sorry.
24          Dr. Pierson admitted the Arms Acres file was highly
25 invasive. She admitted the employer had no reasonable need
26 for that information, yet she persisted for two years in
27 trying to get it. I suggest to you that that really is an

1  example of autocratic behavior. You'll recall that Mr.
2  Buganski described her as an autocrat. An autocrat is
3  really a synonym for a dictator, someone who doesn't brook
4  any questioning. As Mr. Buganski said, Dr. Pierson kept him
5  out of the loop and only talked with her lawyers, none of
6  whom, of course, appeared as witnesses. But her persistence
7  in this release is unexplained. I asked her why for two
8  years they didn't simply give Mr. O'Connor the opportunity
9  to sign something like this. She had no explanation other
10 that obliquely to defer to her attorneys.
11         This is a book I brought along. It's a book I read
12 recently. It is the auto -- not the autobiography -- it's
13 the *Biography of John Adams*. It's a terrific book. It was
14 the *New York Times* best seller for many years. I brought it
15 along because there is an incident in that book that I think
16 is germane to what we're trying to deal with here. As you
17 know, I'm sure, John Adams was the second president of the
18 United States, but what you may not know is that he was one
19 the principle drafters of the Declaration of Independence,
20 and he was the person who primarily wrote the Massachusetts
21 Constitution, which was the basis of the United States
22 Constitution.
23         There was an event that happened in pre-
24 revolutionary Boston. It's known as the "Boston Massacre."
25 It was a situation where there was a riot, and British
26 soldiers -- British soldiers were defending the Custom House
27 in Boston. British soldiers were very, very unpopular in

1  Boston at the time.  At any rate, this riot happened, and
2  the British soldiers killed five Americans.  The British
3  soldiers were brought up on trial.  They could not find
4  anybody to represent those soldiers because representing a
5  British soldier at that point was so unpopular.  It was
6  really detrimental to anybody's -- to a lawyer's career and
7  John Adams was a lawyer.  But John Adams, when he was asked
8  to do it, did it.  He represented those soldiers.  And he
9  lived a long time.  And he would say throughout his life
10 that doing that was one of the best things he ever did, and
11 he explained that he did it because he wanted to preserve
12 the principle of due process.  He wanted to preserve the
13 principle of law.  And even people in that case, very
14 unpopular people, had all the rights under the law.
15         The principle of due process and the principle of
16 law is very evident in this case also.  Mr. O'Connor was a
17 tenured teacher.  Under the law, he could not be terminated
18 unless he was given due process.  He could be terminated --
19 any teacher can be terminated for certain conduct, not for
20 thinking a bad way, not for doing something twenty-five
21 years ago, not for raising a criticism unless it was one of
22 the very specific designated reasons for termination.  There
23 was -- a teacher can be terminated for only certain reasons.
24 And if those reasons are there, a teacher is entitled to due
25 process; namely, a lawyer, the charges against him have to
26 be announced and delineated.  He has a right to a hearing.
27 He has a right to an independent decision maker.  He has

10

1  right to all those things. Not just Mr. O'Connor, every
2  teacher in the State of Connecticut who has been a teacher
3  for more than four years. He was entitled to this due
4  process. He didn't get any of it.
5      You heard several suggestions in the course of the
6  trial -- one was in Attorney Rose's opening statement;
7  another was when Dr. Pierson was on the stand -- about how
8  hard it is to terminate a teacher. First of all, there
9  never was any suggestion that Mr. O'Connor, for instance,
10 should be terminated. His evaluations were very good.
11 There is no evidence at all that he was anything other than
12 a perfectly satisfactory performer as a teacher. He was a
13 "gadfly." He probably was a pain in the butt to Dr.
14 Pierson. But there is no suggestion that he did any --
15 engaged in any conduct that should result in his
16 termination. He never -- he wasn't even reprimanded in the
17 events that predate all of this. And that investigation
18 started in March of '99. He wasn't even reprimanded then.
19 So to the extent it is -- they are intimating that the law
20 is just too difficult, it's so hard to get rid of a teacher,
21 well, tough. If that's what they wanted to do, and I think
22 it was, I think Dr. Pierson's lawyers were trying to figure
23 out a way to do it by the shortcut, he had all the due
24 process rights that were due to every tenured teacher.
25     Now, it is true that Mr. O'Connor has Jason Chu.
26 Remember the young man who came up from Princeton
27 University. Mr. O'Connor was, in Jason's words, unorthodox

1  and informal.  Now, he -- there aren't many teachers who
2  allow you to call them by your first name.  He rode a Harley
3  Davidson on occasion.  He took that Mohawk haircut when his
4  conference won the title.  Certainly, he was unorthodox.
5  Certainly, he was informal.  But he was a good teacher.  He
6  did his job.  He was highly regarded by the parents, highly
7  regarded by the students.  He probably was not highly
8  regarded by some of the faculty, and I'm sure autocratic
9  administrators found him not so pleasant to deal with, but
10 that's their problem.  If Dr. Pierson, who said she is the
11 CEO of the school system, couldn't handle a gadfly, then she
12 had no business being there in the first place.  And if Mr.
13 O'Connor had done anything that deserved discipline, she
14 should have done it the right way, but she didn't nor did
15 she even try.
16          I'm not going to go through all the testimony about
17 Mr. O'Connor and, you know, how he was regarded.  We have
18 the reputation evidence.  You'll recall Mr. Wysmuller
19 testified about his daughter.  She was in a slump after the
20 death of the daughter [sic], and Mr. Wysmuller credits Mr.
21 O'Connor for turning her around.  Harry Geraghty talked
22 about the track -- his reputation among track people.  Liz
23 Kirkpatrick talked about how, in the library, she's the
24 assistant director of the library in Wethersfield, she
25 talked about how the students and the parents -- when the
26 students would find out they were would have Mr. O'Connor as
27 their teacher, they were very happy.  The parents were very

1  happy.  You will see, by the way, there's an Exhibit 18.
2  Oh, here it is.  It's this letter to Dr. -- to Mr. Peruta.
3  Remember the television guy.  Attached to that are,
4  actually, all the documents supposedly that were in the file
5  regarding Mr. O'Connor from 1991 through 2000.  When you
6  read those documents, not everything is positive here, but
7  most things are.  You'll find that in most respects, in
8  every respect that's legitimate that pertains to this case,
9  Mr. O'Connor was a perfectly fine teacher.
10      I want to go through the particular causes of
11 action.  When I get done, Mr. Rose is going to talk to you,
12 then I'll talk to you again briefly.  Then, after that, the
13 Judge, Judge Booth is going to give you the charges.  That's
14 going to be the explanation of the legal parameters of this
15 case.  And this is what I expect you're going to hear.
16      There are three counts.  The first count is
17 invasion of privacy.  This is a species of invasion of
18 privacy, one particular type, and it's called intentional
19 intrusion upon seclusion, and I'll go into that in a moment;
20 number two, intentional infliction of emotional distress;
21 number three, the third count involves an allegation that
22 certain Constitutional rights -- that Mr. O'Connor was
23 disciplined because he exercised certain Constitutional
24 rights, and I'm going to go through each one of these now.
25      So let me start by the first one:  Invasion of
26 privacy or intrusion upon seclusion.  I expect that you will
27 hear that the law of invasion of privacy -- I'm sure you've

1 heard of that term before, but this -- you're now going to
2 learn a lot about it. This is that species, that kind of
3 invasion of privacy called intrusion upon seclusion. All
4 invasion of privacy claims essentially involve one thing and
5 that is the right of every person to be left alone. In
6 other words, all of us have a space where no one else can go
7 unless we invite them there. That's common to all kinds of
8 invasion of privacy. An employer, any employer in private
9 employment and an employee -- let me start over. Every
10 employee, whether in public or private employment has a
11 right to be left alone, to have a certain zone of privacy;
12 and if the employer intrudes upon that seclusion, that's the
13 area of seclusion, it's illegal, and that's what we claimed
14 happened here. This is very important, however, and you'll
15 be told this I believe.

16          It is not necessary for us to prove that privacy
17 was actually interfered with in the following sense. You'll
18 recall that Mr. O'Connor never signed the release. They
19 never got the Arms Acres file. They never got -- I'm not
20 going to go through all the questions that Mr. O'Connor said
21 was in the Arms Acres file, but no reasonable person would
22 want to hear the questions much less the answer. But they
23 never got this information because he didn't sign that
24 release. It is still -- that still can legally be intrusion
25 upon seclusion because attempted invasion of privacy under
26 this circumstance is the same thing as actually doing it.
27 If I were an employer and I demand an answer from my

14

1 employee that I had no right to ask in the first place, I
2 have intruded upon my employee's seclusion. That's exactly
3 what happened in Mr. O'Connor's case.
4     The board of education in Wethersfield tried to get
5 him to sign that release so that they would have access to
6 the most private, personal, potentially embarrassing things
7 that anyone can imagine. Right away, just right off the
8 top, you heard the kind of questions they asked. Any kind
9 of demand by an employer under any circumstances for that
10 access to that information is unreasonable. Keep in mind,
11 I'm not even talking about information that Dr. Schwartz
12 might have wanted. I'm talking about information that the
13 employer wanted. The employer wanted the same information
14 that Dr. Schwartz wanted. If Dr. Schwartz had wanted it, it
15 would have been a whole different story, a whole different
16 case. But that's not what happened. And, in fact, two
17 years later when Mr. O'Connor was finally given the
18 opportunity to sign a release that did not give away his
19 privacy rights as I've mentioned, he did it right away. He
20 went to Yale University. He went to Dr. Zanana. He was
21 examined for hours -- you'll see the part of the report that
22 talks about that; that's in the record -- and he was
23 returned to work forthwith.
24     It is conceivable that at some point in the
25 beginning maybe the board's lawyer at Shipman & Goodwin just
26 messed up when they came up with this release. Let's grant
27 that for the sake of argument: in the beginning. But,

1  eventually, that became more than a mistake. It became
2  willful. It became outrageous. A lawsuit had begun
3  already. It was being hotly litigated. All they had to do
4  was come up with something that looked more like this. They
5  never did it. And I asked Dr. Pierson why. She had not
6  answer. That is completely arbitrary, unreasonable.
7  There's just no excuse. Even if there was one in the
8  beginning, two years later there was no excuse.
9           So that's the first count: Intentional intrusion
10 upon seclusion. You're going to be given a juror
11 interrogatory, a form that asks you to check yes or no as to
12 whether or not Mr. O'Connor has proved that his privacy was
13 invaded, and the answer ought to be yes.
14          The next count is called: Intentional infliction
15 of emotional distress. In a very shorthand kind of a way,
16 that's called outrageous conduct. When an employer or when
17 the government or when, actually, anybody in our society
18 acts in an outrageous fashion and engages in activity that
19 goes beyond the bounds of behavior that is or ought to be
20 tolerated by civilized society and if it causes emotional
21 distress, that action is, that conduct is illegal. That is
22 the tort of intentional infliction of emotional distress.
23          What happened here was outrageous. It is
24 outrageous that the board of education wanted access to his
25 confidential information. It is outrageous that they
26 persisted in demanding that information. It is outrageous
27 that they kept him out of work from a tenured job for two

16

1  years and denied him a salary completely for a year because
2  he would not give up his privacy rights. That is
3  outrageous.
4       In this country today, in the world today, we are
5  faced with ever-increasing infringements on our personal
6  privacy. With digital technology, someone can sit outside
7  your home and listen to your conversations on a mobile
8  phone. It's a real serious threat to our society and our
9  way of life, and this case presents an opportunity to draw a
10 line, at least one line that needs to be drawn, and that is,
11 in this circumstance, no employer, no government agency
12 shall be allowed to get away with demanding the answers to
13 whether or not a tenured teacher masturbated and so forth.
14 That is outrageous. A civilized society cannot allow that
15 to happen.
16      Now, in terms of deciding the second count of
17 intentional infliction of emotional distress, you're going
18 to be asked whether or not the board of education intended
19 to inflict that emotional distress or, or whether it should
20 have known that emotional distress was a likely result of
21 the employer's conduct. On both counts, the answer is yes.
22 The board, yes, intended to apply emotional distress. They
23 were trying to force him to sign this release. They were
24 trying to force him to cave in and submit to this autocratic
25 authority. At the same time, they certainly should have
26 known that this was going to cause him severe emotional
27 distress. Any commonsense person would know. Mr. O'Connor