17

1  was a person who devoted his entire life to his teaching.
2  He was available at all times of day or nights. He ran --
3  runs from his house. He had his telephone number on the
4  board. He volunteered in his spare time. He conducted
5  three track sports. He was the advisor to the newspaper.
6  This was his life. It's kind of a hyperactive life, but
7  this was his life, and it was well known to the defendant.
8  When they put him out of work and deprived him of his
9  ability to do what was meaningful in his life, they
10 absolutely knew it was going to cause severe emotional
11 distress, and even if they didn't absolutely know it, they
12 should have known it, and that's good enough.
13         I expect that Attorney Rose will argue that all
14 they did was to give him what Mr. O'Connor wanted. He filed
15 a lawsuit for an injunction so he wouldn't have to go back
16 to Dr. Schwartz and sign the release. Well, we did what he
17 wanted he will claim. That doesn't go very far, because
18 what they didn't do is give him an alternative. They
19 cornered him. The lawyers Shipman & Goodwin cornered him.
20 They set up a situation where he had two choices: number
21 one, give up my privacy or, number two, stay out of work.
22 Those were his only two choices. When he first filed the
23 lawsuit, perhaps they gave him what he wanted in the
24 beginning for a brief time. But six months later, a year
25 later, a year-and-a-half later, two years later they weren't
26 giving him what he wanted. That's just nonsense. They were
27 turning the screw every day, every hour, and they were doing

18

1 it deliberately knowing full well they were doing it.
2     You'll recall that Shipman & Goodwin was involved
3 in this intimately at every point. In the letters that
4 Attorney Rose introduced, remember that Dr. Pierson talked
5 about his First Amendment rights to complain about the lack
6 of a profanity policy. What she said to the board of
7 education, and you'll have that exhibit, is if you have any
8 questions, call Mr. Mooney, Thomas Mooney, Attorney Thomas
9 Mooney at Shipman & Goodwin. It was being engineered by the
10 lawyers. He was being set up. He was left out there to
11 hang, and it was absolutely deliberate.
12     One of the issues you'll have to face is whether or
13 not the emotional distress was severe. I submit that there
14 was plenty of evidence that it was severe. Mr. O'Connor was
15 incapacitated. Liz Kirkpatrick said that he went to the
16 library and couldn't concentrate. He tried to write. He
17 slept most of the time. He lost eighteen pounds. He had
18 chest pains. Of course it was severe. What Mr. Rose will
19 try to say is that, Well, he was under stress before, and
20 this is just the same thing, so what we did after January of
21 2000, which is when the Dr. Schwartz thing happened, that
22 didn't matter cause it was all ongoing.
23     You heard what Mrs. O'Connor had to say. This was
24 not his usual stress. True he led a stressful life. He's a
25 guy who apparently gets off on that, on this hyperactivity.
26 He's always busy. But they laid him low. They felled him.
27 That was her words. They felled him after January of 2000.

                                                                19

1  The stress that he endured was very severe and was caused by
2  the defendant and occurred after January of 2000.
3          So that's the second count: Intentional infliction
4  of emotional stress. And now the third count. That's the
5  Constitutional Rights matter.
6          You're going to be given an instruction by the
7  Judge on something called "proximate cause." Proximate
8  cause means legal cause. You can have something -- you can
9  have an event that is cause by a number of different things.
10 If any one of them is a substantial reason for that thing
11 happening, it is a proximate cause. In this case, Mr.
12 O'Connor exercised several Constitutional Rights. And the
13 fact that he did so was a proximate cause, a substantial
14 cause of the board striking out at him and the board's
15 lawyers striking out at him.
16         Let's start with the reason why Dr. Pierson had
17 animosity towards him in the first place. You will hear --
18 well, when Mr. Rose talks to you, I'd like you to pay
19 attention to the dates of things. The critical events here
20 happened on January 4, 2000 and afterwards. In January 4,
21 2000 is when he went to Dr. Schwartz and afterwards. I
22 believe that what you are going to hear about are events
23 that are one, two, three, four years old that never resulted
24 in any termination hearings, that didn't result in
25 reprimands, that didn't result in bad evaluations. But Dr.
26 Pierson made it clear that she had animosity for Mr.
27 O'Connor because he kept bugging her about the lack of a

1  profanity policy.  And he wrote letters which are, frankly,
2  somewhat shocking.  He wrote those letters one, two, and
3  three years before, but he did write those letters.  But
4  what was shocking about those letters, as Dr. Pierson
5  admitted, was not the language that was in it but that he
6  quoted language.  He objected to certain -- a lack of a
7  policy and he object to certain things there were required
8  reading in the curriculum.  That is his right to do that,
9  and he quoted some of the language that are in those books.
10 Dr. Pierson wanted it put a little more genteelly.  Perhaps
11 she wanted him just in general to complain about some of the
12 profanity and obscenity without ever really writing it in
13 such a way so that it hit home.  But as every writer knows,
14 if you want to get somebody's attention, if you want to
15 write something's worth reading, you have to be particular.
16 Generalities don't get you very far.  And that's what he,
17 and that's why those things are a little shocking.  It's not
18 his language.  It's the language he quoted that he was
19 objecting to.  Now, we can agree or disagree whether he was
20 right about the books.  That's not the point.  The point is
21 he was complaining about something and something he had a
22 right to complain about, and that was annoying Dr. Pierson,
23 such that by the time of that grievance hearing in December
24 of 1999, she was already or her lawyers were already laying
25 a trap.
26        Now, frankly, it doesn't matter to me in the
27 slightest whether or not that grievance was on December 6 or

1  December 8. She wrote the letter to him on December 7th
2  telling him to go to Dr. Schwartz. But as of December 7th,
3  the only issue that anybody had about his returning to work
4  was whether or not the stress and anxiety of returning to
5  work would cause him physical problems, problems to his
6  heart. That's what Dr. Rubin said. That's what Mr.
7  Buganski said. He said he read Dr. Rubin's October 25
8  letter and he thought Dr. Rubin was concerned about his
9  physical health. Even Dr. Pierson said that. But when you
10 see Exhibit 19 dated December 15, you will see that Dr.
11 Pierson fundamentally changed the terms. No longer was it a
12 concern as she says in her December 7th letter about Dr.
13 Rubin's letter and about the stress and anxiety and the
14 affect that would have on his health. That's all down the
15 tubes. After that grievance hearing, what it is now is
16 psychiatric impairment. That's what she says here to Dr.
17 Schwartz. You'll recall that in the former Soviet Union
18 when people dissented against the government, when they were
19 gadflies, when they were annoying to the government, one
20 stock response in the Soviet Union was to put people in
21 psychiatric institutions. You have to be crazy if you
22 question authority. That was their point of view. This is
23 exactly the same. Regardless of whether or not the
24 grievance meeting was on December 6 or 7 -- December 8, by
25 December 15, Mr. O'Connor's psychiatric mentality, whether
26 or not he had a psychiatric impairment, that was now the
27 question, not his heart, not his physical health. Now she

22

1  had questions about his sanity. And there's something else.
2  When he found himself caught between a rock and a hard place
3  and no where to go: either sign the release and give up
4  your rights or stay out of work, either go back to Dr.
5  Schwartz or be found insubordinate, you recall Dr. Pierson
6  agreed she gave him an ultimatum: You go back to Dr.
7  Schwartz by January 31, 2000. So he say, Okay, I'll go back
8  to Dr. Schwartz. I don't want to be insubordinate. That's
9  certainly a trap, and he filed a lawsuit. What else was he
10 going to do? What else are you going to do at that point?
11 There are no other choices. She agreed that filing a
12 lawsuit is the right of every American. It is in the
13 Constitution that we have the right to redress our
14 grievances. If we have a beef with our government, we have
15 a right to go to court, and she agreed that that's true.
16 And, in fact, she endorsed his First Amendment rights in her
17 letter to the board of education, and so he exercised those
18 First Amendment rights. He filed a lawsuit. The lawsuit
19 might have been meritorious or it might not have. That's
20 not the point. We all have the right to file a lawsuit win,
21 lose, or draw. That is a right. And as a direct
22 consequence of his filing that lawsuit, she canceled the
23 appointment with Dr. Schwartz. It was never again -- he was
24 never again given an opportunity until two years later to
25 find a way through this log jamb, and that was when he was
26 given an opportunity to go to Dr. Zanana, and he immediately
27 did it and he immediately signed this Yale University

1  release and he immediately went back to work. But for two
2  years, by Dr. Pierson's admission, because he filed a
3  lawsuit, he was left in limbo, in purgatory with no place to
4  go and no money coming in.
5       In Mr. Rose's opening statement when we started
6  this trial, he made -- he talked a lot about children.  He
7  told you that this case is about the welfare of the
8  children.  He made accusations about masturbating with gym
9  equipment, yelling at kids.  He said the kids can't be here.
10 He said this was a matter of balancing the rights of kids
11 with the rights of an individual.  There's no evidence to
12 any of that.  That's what he told you in the opening
13 statement.  That's not what happened here.  There is no
14 evidence in the record that any kids were at risk.  There's
15 evidence that there were allegations and there was evidence
16 that Mr. O'Connor never was reprimanded for it and that he
17 was being brought back to work.  There's evidence that he
18 had conflicts with other faculty members and with students,
19 but this is not about children.  Any attempt -- if he gets
20 up here after this to say that, ask where's the evidence.
21 It didn't happen.  It's a smoke screen.  It's an attempt to
22 appeal to raw emotion without any basis in fact.  All the
23 evidence we have -- all the actual evidence we have is that
24 he did his job and he really was devoted to the kids, and
25 not only to the really articulate kids like Jason Chu and
26 the temporarily derailed but brilliant kids like Mr.
27 Wysmuller's daughter who's now getting straight As at

1  Skidmore, but also to people like Jim Tomlinson who took the
2  stand, who probably is one of those trench coat mafia types
3  who if it weren't for people like him might have gone a
4  different way. Rather than being at Antioch University,
5  they might be somewhere else. There's no evidence that he
6  didn't do his job or that he wasn't a good teacher. None
7  whatsoever. It's a stereo to say otherwise. It's smoke.
8       I expect that Mr. Rose will talk about Exhibits
9  CCC. This is Dr. Schwartz's January 10 letter to Dr.
10 Pierson. I expect that he will say that Dr. Schwartz
11 determined that Mr. O'Connor couldn't return to work. Well,
12 Dr. Schwartz was here and he never said anything of the
13 sort. He did write a letter at the very beginning of all of
14 this in which he specifically requested -- he specifically
15 said he wanted the Arms Acres file and he wanted another
16 psychiatric's file, but he also said, I can't determine
17 whether or not Mr. O'Connor is fit to return to work cause
18 the examination isn't complete. But then he says something
19 that is ambiguous. After saying I'm unable to complete the
20 fitness-for-duty examination, he -- in the last sentence, he
21 says (as read): "While I am unable under these
22 circumstances to reach a definitive conclusion about his
23 fitness, elements of his current presentation and history --
24 meaning his ancient history -- suggests that without a
25 thorough, complete psychiatric evaluation, he cannot be
26 considered fit for duty. That is ambiguous. So it means
27 either one or two things: Either I can't determine whether

he's fit because he hasn't completed the exam or I've already determined that he's not fit. Well, let's suppose it's the latter. Let's suppose he determined that he's not fit. Then why in heaven's name did they continue insisting that he return to Dr. Schwartz for the next two years and sign that evaluation [sic]? If Dr. Schwartz is such a genius that he instantly makes up his mind about someone's fitness for duty because he grandfather was an alcoholic and his father died in a bar fight, if that's what modern psychiatry is about, and a lot of it is, if we're going to give that kind of a person the right to keep somebody out of a job based on that kind of a history, then we're all in trouble. But I submit to you that the real thing that he was saying, he probably was a little bit angry that, you know, Herr Doctor didn't get Mr. O'Connor back, but I submit that what he was saying is what those words actually say is that he didn't complete his examination, and unless and until there is a thorough examination, I can't make a determination. But it's one of those two things: either he doesn't know or everything that happened for two years was totally cruel and arbitrary, one of those two things.

You will get an arbitration award -- this is my last point at this time -- an arbitration award from an arbitrator will be given to you. And you will be told by the Judge -- you'll be given some instructions on this. This arbitration award -- as you may know, when you have a union grievance, the grievance is whether or not the

1  collective bargaining agreement was violated.  There was
2  such an arbitration in this case, and part of the
3  arbitration award is going to be before you.  But you will
4  be admonished to keep in mind that that arbitration award,
5  while perhaps giving some background, is not relevant to the
6  issues in this case.  For one thing, the only question in
7  that is whether or not a collective bargaining agreement was
8  violated.  There's no issues about releases or about
9  Constitutional Rights or about intentional infliction of
10 emotional distress or about intrusion upon seclusion.  You
11 will also be told that you are to make your decision based
12 on the evidence you saw and heard here.  And when you do
13 that, you will -- after your deliberations, you will given
14 or during your deliberations you will be given a form and
15 you will be asked essentially three questions:  Was Mr.
16 O'Connor's seclusion intruded upon, and I submit the answer
17 is yes; was there intentional infliction of emotional
18 distress, and I submit the answer is yes; and was there
19 discipline?  Did he lose his salary?  Was he kept out of
20 work?  Was there something negative that happened with
21 regard to his job that happened because he exercised his
22 rights as an American, and the answer there is yes also.
23         So that's all I have for now.  Mr. Rose will now
24 speak to you, and I will have a brief opportunity after
25 that.  So thank you for your attention.
26         THE COURT:  Counsel, you have twelve minutes of
27    your hour left.  Mr. Rose.

27

1  ATTORNEY ROSE: Your Honor, may I hit the men's
2  room real quick, please?
3  THE COURT: I'm sorry?
4  ATTORNEY ROSE: May I use the men's room real quick
5  before we start?
6  THE COURT: Sure.
7  ATTORNEY ROSE: Thank you.
8  THE COURT: All right. Actually, ladies and
9  gentlemen, we'll take a five-minute break in case
10 anyone wants to use the restrooms, and then we'll
11 start with Mr. Rose. We'll just take a five-minute
12 break.
13 THE CLERK: All rise. Court is in recess.
14 (Recess.)
15 THE CLERK: All rise. Court is in session.
16 THE COURT: Okay. Can we have the jury.
17 (The jury entered the courtroom.)
18 THE COURT: All right. Please be seated. The
19 record may reflect that all jurors are present.
20 Ladies and gentlemen, as you know, you've heard the
21 plaintiff's argument. He's reserved actually twelve
22 minutes for rebuttal. Now the defense gets one chance
23 to argue. Mr. Rose.
24 ATTORNEY ROSE: Ladies and gentlemen, Attorney
25 Rosenblatt just left you with the impression that Tom
26 O'Connor was placed between a rock and a hard place. He had
27 two choices: either sign this dreaded release or be found

28

1  insubordinate. I submit to you that Thomas O'Connor had
2  many, many, many choices. One of those choices was as
3  simple as crossing out anything that he opposed to. Cross
4  out the Wethersfield Board of Education; cross out any of
5  their representatives; and sign his name. But he didn't do
6  that. Why?
7        During the opening argument, I told you that it was
8  our belief that this case was about children and it is about
9  children. It's about a school district's duty to make sure
10 that the teachers they put in the classroom for eight hours
11 a day are fit in every single way to work with children.
12 Attorney Rosenblatt told you it's not -- and I know that you
13 know that's not true. It's the board of education's most
14 fundamental duty almost even before education to insure
15 safety.
16        Tom O'Connor's problems over the years reached a
17 critical mass in 1999. You didn't hear everything. You
18 know that. But it reached a critical mass. And when it
19 reached that critical mass, we called in the experts; and
20 the expert in this case, Dr. Hank Schwartz, from our leading
21 hospital in Hartford, saw Mr. O'Connor, asked the standard
22 questions that they ask about background and history,
23 substance abuse problems, any hospitalizations, medications.
24 And then the doctor said, I want to check some more of this
25 out. Asked for verification.
26        Now, Dr. Schwartz never got to complete his
27 assignment, not because of a release but because Thomas

1  O'Connor said you will not and then he filed a lawsuit. Dr.
2  Schwartz never had a chance to complete that release -- or
3  to complete that examination. You also heard Dr. Schwartz
4  testify to one very, very, very important point. Tom
5  O'Connor threatened to sue him. How could he ever give a
6  meaningful examination of someone and be objective and
7  unbiased after they've threatened to sue him.
8         But Dr. Schwartz did tell you something and he
9  didn't have to say it on the stand to do it. He said in the
10 letter that you will see to Dr. Pierson, the January 10th
11 letter. It says that Tom O'Connor, given his history, given
12 his problems, given the two hours that I, Dr. Schwartz,
13 spent with him cannot be considered fit for duty. That was
14 the last medical document that Dr. Pierson had in her
15 possession for two years.
16        Now, it sounds as though Mr. Rosenblatt is
17 indicating that this case isn't whether or not Mr. O'Connor
18 should have been sent to Dr. Schwartz. Maybe he's conceding
19 now that he should have been sent to Dr. Schwartz. But yet
20 he's asking you to find that sending Mr. O'Connor to Dr.
21 Schwartz was in retaliation for some sort of free speech.
22 So I submit to you the case is, at some very fundamental
23 level, about sending him to Dr. Schwartz. Did we have a
24 reasonable ground to send him to Dr. Schwartz? That's an
25 important point.
26        The case has also been about whether the school
27 picks the doctor and lets the doctor pick the records or

whether the employee under investigation picks the doctor, whether the employee says I'm going to tell you what records you can have. And as you have seen in this case, when candor is at issue, which I submit it is, when candor is at issue, you need the raw data. Dr. Schwartz needs the ability to verify what Mr. O'Connor says, whether Mr. O'Connor misleads someone or misremembers or doesn't recall a prescription or a diagnosis. The ability of the trained M.D. to get that raw data is important. Dr. Schwartz independently decided that he needed that information.

Now, in this case, we've shown you that from the very, very, very first moment Tom O'Connor fought that referral. He refused to give Dr. Schwartz any records. He sought a court order precluding that. And then he told you, or his attorney told you that he's always cooperating. In opening statement, he told you he's always cooperating. Ladies and gentlemen, that's not cooperation.

In some ways, this case is about drawing the line in the sand. It's about whether or not we, as a board of education, can send what we perceive as troubled employees to a psychiatrist for a full, robust psychiatric evaluation. Attorney Rosenblatt thinks not. I think so.

It's also, ladies and gentlemen, and I think the central issue in this case is whether or not the employee can come to you as a jury two years later and fool you and say, Oh, no, it's not about whether or not I was going to Dr. Schwartz. It's not about the records. It's the

1 release.  I would have signed any other release if you just
2 had a better release.  That was my problem.  Well, the
3 evidence shows the release was not the problem.  The problem
4 was power.  The problem was Tom O'Connor was not going to be
5 told by what his attorney has referred to on many occasions
6 as an autocratic superintendent about what to do.
7      Tom O'Connor argues or his attorney's argument that
8 he would have signed another release if it was fixed up or
9 typed up, addressed some privacy issue.  That's a ruse.  I
10 beg you when you are considering this to follow the road map
11 that we have laid for you.  We have laid a road map for you.
12 We've not beaten you over the head with the evidence, but we
13 have given you the evidence.  And the evidence shows no
14 where that Mr. O'Connor was going to agree to sign anything
15 until two years later.  And what happened two years later?
16 Well, two years later, his pay ran out, his unemployment ran
17 out, and finally he said, Okay, I'll do what you want.
18 Finally, after two years, he acknowledged that we had the
19 right to send him to a psychiatrist.
20      Now, we couldn't send him to Dr. Schwartz cause he
21 told Harold Schwartz, M.D., the head of the Institute of
22 Living, I am going to sue you for asking me these questions.
23 So we couldn't send him to Dr. Schwartz.  What did we do?
24 We sent him to Dr. Zanana.  And Dr. Zanana asked him the
25 identical questions that Dr. Schwartz asked him.  Dr. Zanana
26 did the exact same thing that Dr. Schwartz did.  He didn't
27 promise him confidentiality.  Dr. Zanana did everything that