32

1  Schwartz did.  The only thing different was O'Connor finally
2  acknowledged that he could longer call the shots.  That's
3  the only difference.
4         Now, this release that you've heard about and I'm
5  sure you'll hear about it some more, it's legalese.  It's
6  drafted by lawyers.  Probably was dictated on the way to a
7  meeting by somebody.  If a seasoned attorney like Mr.
8  Rosenblatt who's been representing Mr. O'Connor for four
9  years was going to allow Mr. O'Connor to see Dr. Schwartz,
10 why didn't he just sign -- put together another release, the
11 releases that he's shown you?  Why didn't he pick up the
12 phone and say, Brenda, Attorney Eckert, your release doesn't
13 conform with what I think my client would like.  Here's my
14 concerns.  Let's compromise.  Well, you know why.  We put
15 the letters from Attorney Rosenblatt in evidence because
16 going back to December and January, Attorney Rosenblatt was
17 saying you have no right to send him to this.  If you want
18 to talk about legal advice, that's the legal that Mr.
19 O'Connor got.  And not once in the past two years has Mr.
20 Rosenblatt ever given another release that would meet this
21 gentleman's satisfaction, not until he went to Dr. Zanana.
22        So really, ladies and gentlemen, what this case
23 boils down to is in sending an individual like Mr. O'Connor
24 to a psychiatrist, is the employer limited or the
25 psychiatrist limited to investigating what he says the facts
26 are or may the psychiatrist investigate matters on his or
27 her own?  That's one part of this case.

33

1    Secondly, how may he or she communicate the
2 results?  At the end of the investigation after it's all
3 done, there's a certain amount of sharing of information.
4 In this case, where we're talking about Dr. Zanana, he
5 summarized everything.  So, to a certain extent,
6 Wethersfield Board of Ed would have to get some information,
7 perhaps in raw data form -- I mean, perhaps in summarized
8 form.  But there was no interest on the part of Wethersfield
9 Board of Education, and you heard Dr. Pierson say it, that
10 they wanted the raw data.  No one wants the raw data.
11 There's no evidence that Dr. Pierson had so much in her day
12 that she wanted to see what Tom O'Connor did back in 1981.
13    Dr. Pierson told you what was in the report of Dr.
14 Zanana, so you know that it's really the same thing that Dr.
15 Schwartz was asking for:  Complete history of drug use,
16 alcohol use, prior diagnoses, prior medications, marital
17 history, family history.  It's all important.  Once O'Connor
18 provided this to Dr. Zanana, he returned to work
19 immediately.
20    So another question we have is what took him so
21 long?  Why did we have to wait two years for the same data
22 we asked for the year before?  Is it a matter of
23 confidentiality?  Well, we know that's not the case.  We got
24 the same information.  Is it a matter of Mr. O'Connor not
25 wanting his friends and neighbors to have access to his
26 medical records, well, we know that's not the case because
27 he could have crossed it out or had his lawyer draft another

34

1  release or he could have picked up the phone.  What was the
2  real reason Tom O'Connor waited two years?  As I said,
3  ladies and gentlemen, it's about power.  Mr. O'Connor had no
4  intention of signing those releases.

5      How do we know that?  Well, first, Dr. Schwartz
6  told you that he refused to give the doctor access to his
7  medical records.  From the very beginning, he refused.  From
8  the very beginning, he was talking to his attorney.  He
9  brought a lawsuit to preclude the IME.  Doesn't ask for a
10 court order saying, please fix the release.  Doesn't ask for
11 a court order saying do something else.  It says (as read):
12 "The plaintiff respectfully requests that a temporary
13 injunction -- a permanent injunction issue forthwith
14 enjoining the defendants from forcing the plaintiff to
15 submit to an examination by the psychiatrist hired by the
16 defendants."  What was he fighting here?  The psychiatrist
17 hired by the defendants, because in Tom O'Connor's mind, you
18 don't have a right to do that.  You can't send me to the
19 psychiatrist.  There's nothing wrong with me.

20     I mentioned, of course, that his lawyer or he never
21 amended the release, so you know he wasn't going to sign
22 one.  Threatened Dr. Schwartz.  His lawyer wrote letter
23 after letter which we talked about.  Exhibit FFF, which
24 would be in evidence (as read):  "There is no legitimate
25 reason for the Wethersfield Board of Education to continue
26 to insist that O'Connor go back to Schwartz.  I am writing
27 to insist that your client take Mr. O'Connor back to full

35

1  duty immediately." And then what he says he -- he doesn't

2  sign my client will sign a different release. We're willing

3  to cooperate. What he says is (as read): "I do, however,

4  take your recent letter seriously. In that letter, you

5  stated Wethersfield would consider O'Connor subordinate if

6  he did not go back to Schwartz. Accordingly, O'Connor has

7  called Schwartz and set up an appointment and O'Connor has

8  issued a release in favor of Dr. Rubin to permit Dr. Rubin

9  to speak to Dr. Schwartz. Well, that doesn't get us what we

10 were looking for, does it? Doesn't get the psychiatrist the

11 data that could help him form a diagnosis for this

12 individual. So even in this letter, there was no

13 cooperation.

14      You saw Exhibit XXX. And, again, in early December,

15 (as read): "Once again, I ask you to reconsider your

16 position that Mr. O'Connor must undergo a psychiatric

17 examination."

18      Ladies and gentlemen, really, isn't that what this

19 case is about? Isn't this case about who gets to decide

20 when an employee, a public teacher gets to go or has to go

21 to a psychiatric evaluation. For the first two years, they

22 fought that tooth and nail, and you never not once saw

23 correspondence indicating that, Well, I'll go if you just

24 tighten up the release. That's a red herring.

25      Now, Mr. O'Connor also said, Well, I didn't sign

26 the release because there was a lot of private information.

27 Mr. O'Connor was a very public man. Very public man. He

36

1  enjoyed that publicity.   Mr. Chu talked about or maybe Mr.
2  O'Connor talked about on direct examination how he had
3  access to Mr. O'Connor's private -- the private
4  investigation that Buganski started.   He listed the charges
5  about the screaming at the young students and the
6  masturbating with the javelin and telling kids -- using bad
7  language.   All of those things were contained in a series of
8  charges.   Mr. O'Connor gave that to one of his students.
9  Now, he told you he didn't, but well all know that the
10  student had to have gotten the document some how.   So this
11  private man is concerned about protecting his privacy, gives
12  a very sensitive document like that out into the public.   He
13  gave a full sit-down interview to the *Hartford Courant*.
14  That's going to be in evidence.   He asked for the grievance
15  hearing that's he talked about a little bit to be an open
16  session.   He shared all of his Arms Acres records, with
17  little exception, with at least two employees of the
18  Wethersfield Board of Education.   Mr. O'Connor himself has
19  no idea where those files are now.   Dr. Zinini received
20  those files, and Mr. Sugrue received those files.   Two key
21  Wethersfield employees.
22          And on the topic of privacy, who can forget when
23  Mr. O'Connor in attempt to explain why he gave it to an
24  employee of the Wethersfield Board of Education violated Mr.
25  Sugrue's anonymity and told all of you and everyone who will
26  read this record and everyone who will read the appellate
27  record that Mr. Sugrue was a recovering alcoholic.   In an

37

1  effort to cover that up, he said, well, everybody knew that.
2  I don't know if that's the case or not, but I'll tell you
3  this:  We didn't know it before.  People in this courtroom
4  didn't know before, and the people who are going to read
5  about it in the Internet didn't know it before.

6           On the topic of privacy, you met Dr. Lynne Pierson,
7  the model of what a superintendent should be, not
8  autocratic.  Outstanding.  Outstanding.  Gave this many
9  every chance in the world to succeed at Wethersfield.  She
10 testified in her years of public education, she's never
11 released confidential medical information; she's never
12 released DCF records; she's never released police records.
13 Remember what Dr. Pierson had back in late December, early
14 January.  She had the letter from Mr. Buganski November
15 forth saying, Come on back to work.  She then had a letter
16 from Mr. O'Connor saying, Well, I can't be there till at
17 least the 23rd.  I have a letter -- an appointment with my
18 doctor.  Then we never hear from him.  Never heard about
19 that appointment with his doctor.  At some point, she gets
20 concerned.  Mr. O'Connor sees Dr. Schwartz.  Dr. Schwartz
21 writes back on the 10th.  I wouldn't let him return back to
22 work.  He cannot be considered fit for duty based on what I
23 have seen.  That's what was facing Dr. Pierson.  We didn't
24 put Mr. O'Connor in a box.  He put himself in a box.

25          One of the things that Dr. Schwartz mentioned as a
26 basis for his concern was Mr. O'Connor's history.  And it is
27 difficult to summarize one man's history of twenty years

38

1   either in a trial or in one-hour closing argument, and I do
2   not intend to do that.  But I do intend to summarize the
3   highlights and the very public other parts of that life that
4   we now know through the evidence in this case.  Mr. O'Connor
5   started teaching in Wethersfield in 1982.  Eventually, he
6   received tenure.  He had a problem with alcohol with a DWI
7   in 1988.  By his own admission, at the same time, he was
8   using drugs which were illegal even though he's a tenured
9   teacher.  And rather than terminate him, rather than do
10  anything inappropriate, the entire leadership of the
11  Wethersfield Board of Education rallied behind him.  Dr.
12  Zinini supported him, Dr. Pierson's predecessor.  Mr. Sugrue
13  helped him.  All sorts of people went to bat for him.  It
14  seems, and I think we can infer this, that what they asked
15  for in return for their support, in return for their not
16  going forward with some sort of suspension or discipline or
17  something like that, it seems that what they asked for was
18  simply an update on his medical condition, and that is why I
19  submit to you that he sent the information to Tom Sugrue and
20  to Mr. Zinini.  All they said is we need to be kept apprized
21  so that when you come back, we know what's going on with
22  your status because if you were a private citizen working at
23  Wal Mart, you would have all the privacy in the world.  But
24  when you're taking taxpayers' dollars and you're sitting in
25  a room with thirteen- and fourteen-year-old kids, we do have
26  an interest in finding out how you're doing and how your
27  recovery is going.

39

1      In the first few years, we know, '89, '90, '91, we
2  know that Mr. O'Connor was sober and that he prospered.  He
3  wrote a gracious, very gracious to Dr. Zinini that I
4  introduced in evidence.  It had gratitude in it and it had
5  humility, two concepts that you often do not see in active
6  alcoholics.  It reflect a new way of life for Thomas
7  O'Connor.  He was humble for the first time.
8      But then time went on.  We know that Mr. O'Connor
9  had some problems in 1993, screamed at a staff member.  By
10  reputation, I believe Dr. Pierson said that he had smashed a
11  desk in the encounter.  We know that he was treated by a
12  psychiatrist in that same year, a psychiatrist that he
13  didn't recall in his interrogatories.  He was out of work
14  for five weeks.  According to his own testimony, the
15  psychiatrist provided him with Depakote, which he described
16  -- I asked him -- but he acknowledged it's a psychotrophic
17  medication.  We all know this also, Mr. O'Connor testified
18  that this doctor was really treating his chest pains.  I
19  always thought cardiologists deal with chest pains and
20  psychologist and psychiatrists deal with mental health
21  issues.  I'll leave that to you deferment.  We don't know
22  what happened because we didn't get records in or we didn't
23  discuss what happened in the next couple of years, but we do
24  know that the wheels really began to fall off in 1996 and
25  1997.  Everything came off.  It wasn't just a little stress.
26
27      In 1996, Mr. O'Connor was removed from A.P.

40

1  English.  Rather than demonstrate the grace that he
2  exhibited in his letter to Dr. Zinini, he raged, he
3  protested.  He didn't try to redress grievances.  He tried
4  to inspire fear and he did.  He retaliated against people
5  He asked federal agents he used to investigate his
6  superiors.  He claimed that the women in his office were
7  discriminating against him on account of his gender and
8  that's why he didn't have A.P. English.  This is the
9  behavior of someone with growing emotional difficulties, and
10  Dr. Pierson, in reviewing his file recognized it.
11       I am not going to republish all of the letters that
12  we have discussed.  I'm not going to republish each one of
13  those.  You've seen those.  You know what they say.  The
14  clerk will be giving you an entire packet of all the
15  evidence in this case.  So as you're thinking there about
16  this theme of the wheels falling off in Tom O'Connor's life
17  in 1996 and 1997, look back at those documents.  You see it
18  happening right there in his own words.
19       Now, Attorney Rosenblatt said something that I
20  found very interesting about the letters.  He said he
21  thought they were shocking.  He said if you want to get
22  someone's attention, use shocking language.  You direct.
23  Well, look at those letters.  Mr. O'Connor did get people's
24  attention.  But it was not that he was talking about his
25  real concerns about books in the school library.  I'll ask
26  you to read those and draw your own inferences of what a
27  professional adult would infer from what Tom O'Connor was

41

1  saying in that correspondence.

2          Now, you heard many, many wonderful things about
3  Mr. O'Connor in his teaching profession, and I do not doubt
4  that.  I do not doubt that at times he reached kids.  But I
5  also know that you heard about what he said to the youngster
6  who is looking to go to Dartmouth College.  I also know that
7  you heard what was said about the investigation that led to
8  his seven-month suspension, not one day, not two day, not
9  three day, seven-month administrative leave.  He can call it
10 whatever he wants, but when you're a tenured teacher and
11 they ask you not to come back for seven months while they
12 interview students, that's a suspension.  Mr. O'Connor
13 himself even admitted some of the things were true.  And he
14 even admitted that if some of them were true, he should have
15 been fired.  Any employee who did those things should have
16 been fired.  Now, we didn't put into evidence whether he did
17 one, two, three, four, five, six, or seven, but by his own
18 admission, some of them were true, and by his own admission,
19 any employee who did those things should have been fired.

20          In order to determine the propriety of what we did,
21 you need to understand the culture of Wethersfield High
22 School.  Those letters were introduced not to shock, not to
23 prejudice, but simply to show some of the culture.  Mr.
24 O'Connor was more than a gadfly.  He was more than a civil
25 libertarian.  He was someone who took his position very
26 seriously, and if you disagreed with him, he fought back,
27 and if you still disagreed with him, he fought back even

42

1   more, and if you still disagreed with him, he went out to
2   cause pain.  When you file a complaint with a federal agency
3   claiming that you were being sexually harassed, based on
4   what he acknowledged here was just an imaginary thought, why
5   would one do that?

6        You remember the letter from Debra Maynard.  She
7   was the track -- the female track coach from Stonington
8   High, and Mr. O'Connor explained that.  He had it all
9   different.  She came up to him and used the F word and she
10  was all upset.  So credibility's important.  And I ask
11  certain questions in this case specifically to allow you to
12  determine Mr. O'Connor's credibility.  Now, once you've
13  determined that credibility, if you found that he's lied on
14  the stand even once, you can infer that he lied at other
15  times.  So when you go back and read the Debra Maynard memo,
16  ask yourself which one sounds right.  Would somebody who
17  started an altercation, a Stonington track coach who started
18  an altercation completely make everything up and ask for an
19  investigation or is the alternative really what happened.
20  Now, that's the history that Zanana had.  That's the history
21  that Pierson had.

22        So we come back to 1999 and with all this
23  information what does this monolith Wethersfield Board of
24  Education, this autocratic superintendent who's out to
25  destroy him?  What do they do with that information?  What
26  do they do?  They take him back.  Do they terminate him?
27  No.  Do they suspend him without pay?  No.  They take him

43

1  back.   They say we're going to put you back, Mr. O'Connor,
2  subject to a very strict remediation plan.   You've been with
3  us for a long time.   We're going to give you the benefit of
4  the doubt, but we are concerned about you and what you do.
5  And they gave him a very strict remediation plan.   So
6  strict, that by Mr. O'Connor's own admission, when he came
7  back after seeing Dr. Zanana, he could only last six weeks.
8  That's it.

9        Essentially, ladies and gentlemen, we've come full
10  circle.   You will get this case, a case that started out
11  with Attorney Rosenblatt and I interviewing you will end
12  with you deliberating on this case.   Before you go in, I
13  want to read to you a portion of an exhibit.   Attorney
14  Rosenblatt did mention it.   Now, you know when you're in a
15  union, I think we've learned that from this case, that when
16  you're in a union, you can bring grievances and you go
17  through the grievance process to address certain things.
18  You will have Exhibit, I believe it is, SSSS, SSSS is the
19  arbitration.   Very important document.   Don't take my word
20  for it.   Don't take Attorney Rosenblatt's word for it.   Read
21  this.   This is the decision of a neutral arbitrator, not a
22  lawyer hired by anybody, not Tom Mooney at Shipman &
23  Goodwin, not the union's attorney.   This is a decision by an
24  arbitrator.   And the arbitrator goes through the entire
25  history.   He makes some interesting points that I think you
26  will want to see.   He makes the point that we did not
27  violate the collective bargaining agreement in placing Mr.

44

1  O'Connor on leave.  He makes the point that Mr. O'Connor is

2  not entitled to salary.  He makes the point that for the

3  three years of this process, the board, even though it

4  didn't have, paid Mr. O'Connor's eleven-thousand-dollar-a-

5  year health insurance premiums.  Read this document.

6      Now the first claim that Mr. O'Connor has in his

7  lawsuit, which is what's been addressed by Attorney

8  Rosenblatt, is his First Amendment retaliation claim.  And

9  in that case, what he contends is that we cooked all this up

10  because he filed a grievance over his track job.  The

11  Wethersfield Board of Education was so upset that he filed a

12  grievance over losing his track job that we hired Dr.

13  Schwartz, retained counsel, put him out on suspension and

14  did all these things to retaliate against him for that.

15  That doesn't make any sense whatsoever.

16      The next thing he does in that same count, that

17  retaliation/free speech count, he says that we retaliated

18  against him because he filed the lawsuit, and Attorney

19  Rosenblatt's right.  I am going to ask you to think about

20  this from a commonsense perspective.  He asked in the

21  lawsuit for an injunction not to go to Dr. Schwartz.  We

22  gave him that.  There is no evidence in this trial that

23  after we gave him the injunction, Attorney Rosenblatt,

24  before Mr. O'Connor ever said, Hey, we have to get this

25  resolved, there's no evidence that he said, Well, now we got

26  to deal with the release.  There was two scorpions in a

27  bottle by his actions, not ours.  He alone -- he alone