45

1  failed to get a favorable ruling on that lawsuit to this
2  day.  There's no evidence that he got an injunction.
3  There's no evidence that he got a declaratory relief saying
4  that our actions were improper.  So how could we have
5  retaliated against him by giving him the very thing that he
6  asked for in a lawsuit?  Do you really believe that the
7  reason we sent him to Dr. Schwartz was because he filed a
8  grievance or because he filed a lawsuit?
9          The next claim that Mr. O'Connor has is for
10 invasion of privacy.  Now, that is a reasonableness
11 standard.  It might be unreasonable employer, say, at Wal-
12 Mart to ask for psychiatric records.  It may be entirely
13 appropriate for the bar examining committee to ask for
14 psychiatric records.  It may be entirely appropriate for the
15 secret service to ask for psychiatric records.  It may be
16 entirely appropriate for the FAA to ask for psychiatric
17 records.  So it is a reasonableness standard.  You must
18 consider the reasonableness of what the Wethersfield Board
19 asked for in light of all of the facts that we knew about
20 Mr. O'Connor and in light of all of the circumstances that
21 were going on.  It's not simply enough to say, well, it's
22 private information because we all give up some of our
23 rights as we enter public service.  Mr. O'Connor was a
24 public servant.  The arbitrator said something interesting
25 on this that I would like to share with you.  This is the
26 arbitrator who -- hired by neither side.  He writes (as
27 read):  "The administration's insistence on a psychiatric

46

1  evaluation provides no assistance to O'Connor in this case.
2  Based upon statements from O'Connor's own doctor and
3  O'Connor's unusual past behaviors in the workplace and his
4  failure to promptly and clearly resolve his medical status
5  once his administrative leave ended, the board had a
6  reasonable basis to be concerned about O'Connor's
7  psychological fitness.  The board has a responsibility to
8  insure that staff are fit for duty including from a
9  psychiatric standpoint and perhaps especially from a
10  psychiatric standpoint.  In the instant case, the board had
11  a reasonable basis to believe that O'Connor might have
12  psychological problems that rendered him unfit for duty.
13  O'Connor's refusal to cooperate in obtaining a psychiatric
14  evaluation did not, under the contract, entitle him to a
15  paid leave apart from sick leave and, indeed, arguably, did
16  not even entitle him to paid sick leave -- which we gave
17  him.  All O'Connor had to do at any time was (1) acknowledge
18  the board's right to a full psychiatric evaluation and (2)
19  obtain such an evaluation.  O'Connor's good faith in this
20  entire matter is seriously in doubt because he could have
21  used his group health insurance to obtain a full psychiatric
22  evaluation.  It is inexplicable that he has chosen not to do
23  so."
24       Now, on the question of good faith, which is at
25  issue, because Attorney Rosenblatt has asked you find that
26  we intentionally wanted to cause him harm, I think this
27  particular passage is appropriate.  (As read):  "The board

47

1  has continued to pay 90 percent of his group health
2  insurance at considerable cost to the board.  It is
3  difficult to question the board's good faith when it has
4  continued to provide this benefit despite no apparent
5  contractual requirement to do so."  Now, Attorney
6  Rosenblatt's going to tell you to disregard this.  He's
7  going to tell you it's not relevant to this; it's not
8  relevant to that.  I submit that this document is relevant
9  as you deem it fit.  At the end of the day, this is a case
10 about commonsense.  Mr. O'Connor had a collective bargaining
11 agreement.  He filed a grievance under that collective
12 bargaining agreement, said I should have got my pay.  You
13 didn't have a right to do this, and this is the result.
14         The last claim that Mr. O'Connor has is for
15 intentional infliction of emotional distress.  And as Leon -
16 - as Attorney Rosenblatt, I'm sorry, indicated to you, one
17 of the elements is that you have to show that we intended or
18 knew or should have known that we were going to cause severe
19 emotional distress.  Well, there's certainly no evidence
20 that our purpose was to cause him emotional distress.
21 There's certainly no evidence that that was why we were
22 doing it, that it played a motivation.  While it is possible
23 -- and you will hear a charge from the Judge about some
24 normal distress you get in the work place, it's possible
25 that we knew there would be some distress just like any of
26 us has distress when we go to work, when we meet a client,
27 when we handle a new case.  Any of us has that stress.  What

1  this is is a stress of a very, very different kind.  It's a

2  stress that you should never expect in any decent of

3  civilized society.

4       Another element is that the conduct was extreme and

5  outrageous.  Sending a teacher who's in a position of public

6  trust to an IME and requiring them, yes, requiring them to

7  give documents to the psychiatrist, not us, to the

8  psychiatrist is not extreme and outrageous.  Now, how does -

9  - we all agree that.  I think we have to all agree that.

10  Now, how does Attorney Rosenblatt get around that.  Well,

11  what he says is, Oh, no.  Dr. Pierson wanted to share the

12  information with Mr. O'Connor's friends and neighbors.  You

13  know that's not true.  You know that's not true.

14       The last element that you're also going to have to

15  think about is that the emotional distress if it was caused

16  was severe, very, very severe beyond that which one might

17  expect.  Yet, Mr. O'Connor brought not one doctor to testify

18  significant details about the severity of his distress.  No

19  psychologist came in.  No psychiatrist.  No one said they

20  had to up his medications.  Dr. Rubin, his cardiologist made

21  some vague statements.  You also remember Dr. Rubin was the

22  gentleman who said Mr. O'Connor yelled at him for returning

23  him back to work.  I thought that was interesting.

24       On the issue of good faith, I ask you to consider

25  these points before I turn the lectern over to my colleague.

26  In 1997, Dr. Pierson, acting in good faith, gave Mr.

27  O'Connor A.P. English back.  It's what he wanted and she did

49

1  it.  That's good faith.  We didn't go into great detail on
2  this, but when you look at what Dr. Pierson gave to this Ed
3  Peruta fellow, she protect Mr. O'Connor.  What Peruta asked
4  for is all the records involving Mr. O'Connor.  Well, you
5  know what, ladies and gentlemen, she could have given him
6  all those nasty letters; she could have given him all the
7  complaints; she could have given him the report that Emily
8  Peel sent in; and she didn't.  She met with her attorney.
9  They limited as much as they could under the Freedom Of
10 Information Act and put together a fairly innocuous package
11 for Mr. Peruta.  Why?  Because she was trying to protect Mr.
12 O'Connor.  Is that bad faith?  Is that someone who's out to
13 destroy a man's teaching career?  She continued his pay in
14 1999, April, May, June, August, September, October, all the
15 way through even though his own doctor said he should be on
16 sick leave.  She didn't deplete his sick bank for that.
17 That's good faith.  She continued his health benefits.
18 Ladies and gentlemen, Dr. Pierson sought legal advice from
19 very, very good attorneys.  She did not act in a manner here
20 all on her own to try to destroy this man.  She tried to do
21 the best she could given her very difficult job and the
22 concerns that he was raising through legal counsel.  And
23 speaking of good faith, I ask you to consider this:  Mr.
24 O'Connor told you that after his final outburst, the one
25 after six weeks, he still was paid for another year.  That's
26 good faith.
27        We've heard all about Mr. O'Connor's rights, and if

50

1  he were solely a private citizen, I agree that his claim of
2  privacy might ring more true, but he's a public servant, and
3  public servants carry higher standards.  And the first
4  standard, the first thing that we require is to have a fit
5  teacher who is fit and appropriate for children.  Dr.
6  Pierson did what we want our public servants to do.  She
7  tipped the balance to the best of her ability in favor of
8  kids, and then she deferred to the legal process.
9        Two thousand years ago, Attorney Rosenblatt talked
10  about -- two hundred years ago -- but two thousand years
11  ago, one of the greatest boasts you could ever give is I am
12  a Roman citizen, and during the Cuban missile crisis, one of
13  President Kennedy's advisors said the proudest boast you can
14  ever have is that I'm an American citizen.  Don't the
15  responsibilities of our citizenship and the obligations that
16  we have as public servants -- public servants require us to
17  agree to give a little bit when it's required?  As you begin
18  your deliberations, ladies and gentlemen, I ask you to
19  consider this:   In the light of the history that we've gone
20  through in the past twenty years in this country, are we so
21  safe that a superintendent such as Dr. Pierson can disregard
22  history, experience, reputation, recommendations, and
23  intuition?  I ask you to give a defendant's verdict, to
24  return a defendant's verdict on each of the three counts in
25  this case after you fully deliberate and consider all of the
26  evidence before you.  And I thank you very, very much for
27  your service.  Thank you.

51

1      THE COURT:  Thank you, Mr. Rose.  Mr. Rosenblatt.
2      ATTORNEY ROSENBLATT:  I think I want to concentrate
3   on what's not in the evidence.  Most of what Attorney Rose
4   just told you is not evidence at all.  It's in his
5   imagination.  For instance, there's no evidence at all about
6   whether this could have happened.  There's no evidence at
7   all about what transpired between me and Attorney Eckert
8   except for some letters.  He tried to suggest based on no
9   evidence at all that I never talked to her about amending
10  this.  By the way, even if I had, even if they had agreed to
11  amend it the way Attorney Rose is now saying, it still
12  didn't work because there was a lot more wrong with this.
13  It still would not have met federal law.  There still would
14  not have been an expiration date.  There still would not
15  have been a check off as to what you can release and what
16  you can't release.  There still wouldn't have been -- or
17  there may have been the name of one person here.  I suppose
18  he's saying that Dr. Schwartz.  There would not have been
19  any of the warnings that are supposed to be on these things.
20  Mr. Rose told you that the questions that Dr. Schwartz asked
21  were standard questions.  They're always asked.  There's no
22  evidence of that.  Whether he's right or he's wrong, there's
23  just no evidence.  He's making up the case that he wished
24  you had seen.  Dr. Schwartz said that Brenda Eckert told him
25  that Mr. O'Connor wanted to sue him.  That's the only
26  evidence there is of that.  There's no evidence of when it
27  happened or what were the circumstances or even that it

52

1  happened.   Brenda Eckert is the attorney from Shipman &
2  Goodwin who drafted this thing in the first place.   Mr. Rose
3  told you that Shipman & Goodwin was composed of very, very
4  good lawyers.   There's no evidence of that, in fact, to the
5  contrary.   The evidence is that they don't even know how to
6  read the federal law and draft a release that complies with
7  it.   He suggested that maybe this was dictated on the way --
8  I didn't -- I don't recall where somebody might have been
9  driving to while this was being dictated, but perhaps that's
10 true, but that does not suggest that these are a bunch of
11 very, very good lawyers.   Mr. Rose told you that they did
12 not want to see the raw data, but, in fact, Mr. Buganski
13 said he did.   At his deposition, he said -- he admitted he
14 would probably read the Arms Acres file.   Remember that
15 little encounter when I said this a little bit like closing
16 the barn door after the horse has escaped?   That's when that
17 happened.   He said, Well, if I was reading the Arms Acres
18 file and I found out that there were these questions there
19 that I didn't want to know about, I -- well, I don't know
20 what he said -- close the file I suppose is what he meant.
21 But he was going to read the file.   He said that.   Now maybe
22 he would have closed it.   Maybe he wouldn't have.   But the
23 point is if you have a right to privacy, it should be you,
24 the person whose privacy is being protected that makes the
25 decision about whether the book is going to be closed or
26 not.   Mr. Rose talked to you about the information that Dr.
27 Pierson got about Dr. Zanana's report.   There was no

53

1  evidence of that.   There was no evidence of what release Mr.
2  O'Connor signed to allow her to get even Dr. Zanana's
3  report.   Mr. Rose talked about the lawsuit.   You'll have the
4  lawsuit.   I've forgotten which exhibit it is.   Oh, I think -
5  - well, I can't reach it -- oh, yes, I can.   It's Exhibit
6  LLL.   This is my copy of it.   But you'll read in that
7  lawsuit that it is very explicit that Mr. O'Connor was
8  complaining about the confidentiality between him and Dr.
9  Schwartz.   There wasn't any confidentiality.   He complains
10  about the release.   He does that in several places.   What
11  Mr. Rose did is he held up a board just now with one
12  paragraph on it.   You'll have the whole thing.   You can look
13  at it.
14        Mr. Rose said that Mr. O'Connor admitted to taking
15  drugs while he was a teacher.   That's, frankly, outrageous.
16        Can I have Exhibit PPPP, please.
17        What he's referring to is that one page of the Arms
18  Acres file where Mr. Rose jumped up in his very first
19  question in cross examination of Mr. O'Connor and --
20        The QQQQ?
21        He jumped up and said, Ah-ha.   You forgot to cross
22  everything out here.   It says here:   Four joints daily for
23  the last.   And Mr. O'Connor said that's past medical
24  history.   It never happened while I was a tenured teacher.
25  But, just now, he said to you that he admitted that he
26  smoked marijuana while he was a tenured teacher.   He made
27  that up.

54

1  He talked to you about that statement that Mr.
2  O'Connor supposedly made to a student going to Dartmouth
3  College.  Mr. O'Connor asked Mr. -- Mr. Rose asked Mr.
4  O'Connor whether he made that statement, and Mr. O'Connor
5  said no.  There's no evidence that the statement was made.
6  A question from Mr. Rose is not evidence.  But that's all it
7  was.

8  Mr. Rose told you that Mr. O'Connor's being out of
9  work for seven months is a suspension.  There's no evidence
10 about that.  Everyone said the opposite, in fact.  It wasn't
11 a reprimand.  Mr. Buganski didn't say it was; Dr. Pierson
12 didn't say it was; only Mr. Rose said it was, and he made it
13 up.

14 He told you about his so-called very strict
15 remediation plan when Mr. O'Connor came back.  He told you
16 that Mr. O'Connor could only last six weeks.  There's no
17 evidence of that.  The evidence is is that Mr. O'Connor
18 retired.  But the rest of what Mr. Rose told you is
19 contained in the questions, the leading questions which he
20 asked on cross examinations.  He may not have liked the
21 answer, but there is no evidence to support the statements
22 he just made to you.

23 Regarding the arbitration, regarding that decision,
24 that's a decision on a collective bargaining agreement.
25 It's a decision on a different set of issues.  The issue is
26 whether under the union contract, such and such could have
27 and should have happened.  That is not a case having to do

55

1  with intentional infliction of emotional distress, invasion

2  of privacy, violation of Constitutional Rights.   The

3  evidence that you decide the case on is what you saw and

4  heard right here.

5          There's no evidence that I failed to get an

6  injunction.   There's no evidence at all about what happened

7  to the federal lawsuit.   Nothing.   There's no evidence that

8  Mr. Peruta asked for all the records and that Dr. Pierson

9  only gave him innocuous ones.   There's no evidence that Dr.

10 Pierson met with her lawyer to try to protect Mr. O'Connor

11 from Mr. Peruta.   No evidence whatsoever of any of that.

12         Finally, there is no evidence that a public servant

13 has to meet higher standards than other people.   Certainly

14 not -- maybe the president of the United States does, maybe

15 elected people do, but there's no evidence whatsoever that a

16 teacher has to do anything. You won't hear it from the Judge

17 in his charge to the jury, and certainly that is true with

18 regard to privacy.   There is no requirement anywhere that a

19 tenured teacher gives up his right to privacy just because

20 he becomes a teacher.   It's simply a made-up legal theory

21 based on nothing at all.

22         So that's all I have.   I'll sit down and I leave

23 you to determine what really happened in this trial.   Thank

24 you.

25         THE COURT:   Thank you.   Ladies and gentlemen,

26         although I have not timed the charge, I think it's in

27         the neighborhood of half an hour, maybe a bit less.

83

## C E R T I F I C A T I O N

I hereby certify the foregoing is a true and accurate transcript of the tape-recorded proceedings taken by me in Docket No. CV01-0808376, Thomas O'Connor vs. Wethersfield Board of Education, heard before the Honorable Kevin E. Booth, Judge of the Hartford Judicial District on the 18th day of September 2003 at Hartford.

Dated this 10th day of March 2004 at Hartford.


Connie D. Fendley
Court Monitor